1  ALLEN HYMAN, ESQ. (CBN: 73371)
   LAW OFFICES OF ALLEN HYMAN
2  10737 Riverside Drive
   North Hollywood, California 91602
3  T: (818) 763-6289
   F: (818) 763-4676
4  Email: lawoffah@aol.com

5  (Pro Hac Vice Application Pending)

6  JAMES V. CALTAGIRONE, ESQ. (Bar No. 136233)
   LAW OFFICES OF JAMES V. CALTAGIRONE
7  111 S. Moody Avenue
   Tampa, Florida 33609
8  T: (813) 251-3341
   E: caltagironelaw@aol.com
9
   Attorneys for Plaintiffs
10

11                    UNITED STATES DISTRICT COURT
12                    MIDDLE DISTRICT OF FLORIDA
13
   MICHAEL MCGEE, an Individual;  )  Case No.
14 REMA MCGEE, an Individual;     )
   ROBERT J. RYAN, an Individual; )  COMPLAINT FOR:
15 DAVID E. SCHEUERMAN, an        )
   Individual; DAWN A. SCHEUERMAN,)  (1) VIOLATION OF FEDERAL
16 an Individual; NANCY A.        )  SECURITIES LAWS, SECURITIES ACT
   SCHEUERMAN, an Individual;     )  OF 1933(2)(1), 15 U.S.C.
17 JOSEPH PAWLIK, JR., an         )  77(B)(1), SECURITIES EXCHANGE
   Individual; KIMBERLY MURRAY, an)  ACT OF 1934 3(A)(10 15),
18 Individual; SCOTT MURRAY, an   )  U.S.C.A. 78(C)(A)(10)
   Individual; VICKY POHL, an     )  (2) VIOLATION OF THE INTERSTATE
19 Individual; KEVIN POHL, an     )  LAND SALE ACT 15 U.S.C. 1701
   Individual; DANIEL REMUS, an   )  (3) RICO
20 Individual; DAVID J. REMUS, an )  (4) FRAUD (INTENTIONAL
   Individual; DAYLEN REMUS, an   )  MISREPRESENTATION)
21 Individual; TIFFANY REMUS, an  )  (5) FRAUD (CONCEALMENT)
   Individual; HAL HAMPTON, an    )  (6) CONSPIRACY TO COMMIT FRAUD
22 Individual; LOURDES HAMPTON, an)  (7) PROFESSIONAL NEGLIGENCE
   Individual; IAN B. CURRIE, an  )  (8) CONSTRUCTIVE TRUST
23 Individual; MELISSA CURRIE, an )  (9) BREACH OF CONTRACT; AND
   Individual; VI-C INVESTORS,    )  (10)NEGLIGENT MISREPRESENTATION
24 LLC; KURT M. ZURAWSKI, an      )
   Individual; REBECCA L. GRAEBER,)  [JURY TRIAL DEMANDED]
25 an Individual; TERESA          )
   NISIVOCCIA, an Individual;     )
26 DAVID NISIVOCCIA, an           )
   Individual; KEVIN HUNTER, an   )
27 Individual; JOHN JORDAN, JR.,  )
   an Individual; TERI JORDAN, an )
28 Individual; LUCY D. GREENE, an )
   Individual; DAVID GOETTGE, an  )

                    COMPLAINT
S:\Shared Data\PC7\Sarasota Cay Club\COMPLAINT121609.wpd

```
 1 │ Individual; LYNN E. STEVENSON,  )
   │ an Individual; JOHN STEVENSON,  )
 2 │ an Individual; LORI WALLER, an  )
   │ Individual; SARIT NETANEL, an   )
 3 │ Individual; ERAN NETANEL, an    )
   │ Individual; CLARK BLACKWOOD, an )
 4 │ Individual dba BFS EAGLE LLC;   )
   │ ANDREW M. CRIPE, an Individual; )
 5 │ KRISTI CRIPE, an Individual;    )
   │ VYTAS ANKAITIS, an Individual;  )
 6 │ MARILEE ANKAITIS, an            )
   │ Individual; RANDALL RICHARDS,   )
 7 │ an Individual; JAMES WALKER, an )
   │ individual; and ANNIE M.        )
 8 │ WALKER, an individual,          )
   │                                 )
 9 │               Plaintiffs,       )
   │                                 )
10 │ v.                              )
   │                                 )
11 │ MIKE COOK, an Individual and    )
   │ dba UBIDPROPERTIES.COM; BRYAN   )
12 │ MARSH, an Individual, and dba   )
   │ UBIDPROPERTIES.COM; GREEN       )
13 │ CAPITAL, LLC DBA                )
   │ UBIDPROPERTIES.COM, an Arizona  )
14 │ Limited Liability Company; JOHN )
   │ SITEK, an Individual;           )
15 │ INTERNATIONAL ASSOCIATION OF    )
   │ INVESTORS, a Nevada             )
16 │ Corporation; DON BURNHAM, an    )
   │ Individual; JUSTIN BURNHAM, an  )
17 │ Individual; MARC BURNHAM, an    )
   │ Individual; GEORGE HOMICK, an   )
18 │ Individual; CINDY RICHICHI, an  )
   │ Individual; KELLY SCHNORENBERG, )
19 │ an Individual; SELECT MARKET    )
   │ REAL ESTATE, a Colorado         )
20 │ Corporation; ICG, a California  )
   │ Corporation; ADIEL GOREL, an    )
21 │ Individual; DAN BEIT, an        )
   │ Individual; TRUDY HERRELL, an   )
22 │ Individual; RON TAGER, an       )
   │ Individual; WEALTH QUEST        )
23 │ INVESTMENTS, an Entity Unknown; )
   │ BARRY GRAHAM, an Individual;    )
24 │ RICKY STOKES, an Individual;    )
   │ COLIN BRECHBILL, an Individual; )
25 │ JOHN SINCLAIR, an Individual;   )
   │ PARKVIEW HOSPITALITY GROUP,     )
26 │ LLC, a Florida limited          )
   │ liability company; GREG WRIGHT, )
27 │ an Individual; SARASOTA CAY     )
   │ CLUBS COA INC., a Florida       )
28 │ Corporation; NICHOLAS MAVRIKAS, )
   │ an Individual; ROBERT HAYWOOD,  )
```

**COMPLAINT**
- 2 -

1 | an Individual; STUART KAPLAN, )
   | an Individual; GAIL TAYLOR, an )
2 | Individual; DEREK TAYLOR, an )
   | Individual; S BAY, LLC, a )
3 | Florida Limited Liability )
   | Company; S-BAY DEVELOPMENT, )
4 | LLC, a Florida Limited )
   | Liability Company; SUNVEST )
5 | RESORTS COMMUNITIES LLC, a )
   | Florida Limited Liability )
6 | Company; GSJV MIG LLC, a )
   | Florida Limited Liability )
7 | Company; HARRIS FRIEDMAN an )
   | Individual; HARVEY BIRDMAN, an )
8 | Individual; HERBERT HIRSCH, an )
   | Individual; HARVEY BIRDMAN )
9 | REVOCABLE TRUST, an Entity )
   | Unknown; DIANE S. BIRDMAN, an )
10 | Individual; DIANE S. BIRDMAN )
   | REVOCABLE TRUST, an Entity )
11 | Unknown; LOUIS BIRDMAN, an )
   | Individual; LOUIS BIRDMAN )
12 | REVOCABLE TRUST, an entity )
   | unknown; BONITA HIRSCH, an )
13 | Individual; BONITA HIRSCH )
   | REVOCABLE TRUST, an Entity )
14 | Unknown; DC 705 JV, an Entity )
   | Unknown; DC 705, LLC, a Florida)
15 | Limited Liability Company; CC )
   | 705, LLC, a Florida Limited )
16 | Liability Company; JDI TAVASTA )
   | LLC, an Illinois Limited )
17 | Liability Company; JEFFREY )
   | AEDER, an individual; KEVIN )
18 | CONNER, an individual; COLONIAL)
   | BANCGROUP, INC., an Alabama )
19 | Corporation; DAVID W. SCHWARZ, )
   | an Individual; F. DAVE CLARK, )
20 | an Individual; WATERFRONT )
   | RESORT REALTY, an Entity )
21 | Unknown; CRISTAL CLEAR KEYS )
   | REALTY LLC, a Florida Limited )
22 | Liability Company; IMGA )
   | Academies, LLC, a Florida )
23 | limited liability company; )
   | DAVID BAND, an individual; )
24 | JOSEPH GOENNER, an Individual; )
   | BENCHMARK APPRAISAL SERVICES, )
25 | INC., a Florida Corporation; )
   | REAL PROPERTY APPRAISERS, INC.,)
26 | a Florida Corporation; DAVID E.)
   | DRIGGERS, an Individual; STUMP,)
27 | STOREY, CALLAHAN, DIETRICH & )
   | SPEARS, a Florida professional )
28 | law organization; W. SCOTT )
   | CALLAHAN, an Individual; JP )

---

**COMPLAINT**

- 3 -

```
 1 │ MORGAN CHASE BANK, N.A., a New  )
   │ York corporation; ROSS PICKARD, )
 2 │ an Individual; NATIONAL CITY    )
   │ MORTGAGE, an entity unknown;    )
 3 │ CRAIG FLAHERTY, an individual;  )
   │ COMMONWEALTH TITLE; GARY        )
 4 │ SCHWARZ, an individual; FIFTH   )
   │ THIRD BANK; ORION BANK; HEATHER )
 5 │ MORRISON, an individual; and    )
   │ FIDELITY TITLE,                 )
 6 │                                 )
   │                                 )
 7 │              Defendants.        )
   │ _____)
 8 │
 9 │        Forty-two (42) Plaintiffs: Michael McGee ("M. McGEE"),
10 │ Rema McGee ("R. McGEE"), Robert J. Ryan ("RYAN"), David E.
11 │ Scheuerman ("D. E. SCHEUERMAN"), Dawn A. Scheuerman ("D. A.
12 │ SCHEUERMAN"), Nancy A. Scheuerman ("N. SCHEUERMAN"), Joseph Pawlik,
13 │ Jr. ("PAWLIK"), Kimberly Murray ("K. MURRAY"), Scott Murray ("S.
14 │ MURRAY"), Vicky Pohl ("V. POHL"), Kevin Pohl ("K. POHL"), Daniel
15 │ Remus ("DAN REMUS"), David J. Remus ("D. J. REMUS"), Daylen Remus
16 │ ("D. REMUS"), Tiffany Remus ("T. REMUS"), Hal Hampton ("H.
17 │ HAMPTON"), Lourdes Hampton ("L. HAMPTON"), Ian B. Currie ("I.
18 │ CURRIE"), Melissa Currie ("M. CURRIE"), VI-C Investors ("VI-C"),
19 │ Kurt M. Zurawski ("ZURAWSKI"), Rebecca L. Graeber ("GRAEBER"),
20 │ Teresa Nisivoccia ("T. NISIVOCCIA"), David Nisivoccia ("D.
21 │ NISIVOCCIA"), Kevin Hunter ("HUNTER"), John Jordan, Jr. ("J.
22 │ JORDAN"), Teri Jordan ("T. JORDAN"), Lucy D. Greene ("GREENE"),
23 │ David Goettge ("GOETTGE"), Lynn E. Stevenson ("L. STEVENSON"), John
24 │ Stevenson ("J. STEVENSON"), Lori Waller ("WALLER"), Sarit Netanel
25 │ ("S. NETANEL"), Eran Netanel ("E. NETANEL"), Clark Blackwood, dba
26 │ BFS Eagle LLC ("BFS EAGLE"), Andrew M. Cripe ("A. CRIPE"), Kristi
27 │ Cripe ("K. CRIPE"), Vytas Ankaitis ("V. ANKAITIS"), Marilee
28 │ Ankaitis ("M. ANKAITIS"); Randall Richards ("RICHARDS"); James
```

1 | Walker ("J. WALKER"), and Annie M. Walker ("A. WALKER"),

2 | (collectively, "PLAINTIFFS"), allege as follows:

3 | <u>**JURISDICTION**</u>

4 |      1.   This Court has original jurisdiction pursuant to 28

5 | U.S.C. § 1331. This complaint alleges violations under Section

6 | 10(b) of the Securities Exchange Act, 15 U.S.C., §§ 78j(b) and

7 | 78t(a), violations pursuant to 18 U.S.C. § 1964(c), under the

8 | Racketeer Influenced and Corrupt Organizations Act ("RICO"), and

9 | original jurisdiction pursuant to 15 U.S.C. § 1719 in that

10 | PLAINTIFFS claims also arise under the Interstate Land Sales Act,

11 | 15 U.S.C. § 1701 et seq. This Court should appropriately exercise

12 | its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the

13 | state law and common law claims, in that they arise out of the same

14 | facts and circumstances as the federal claims.

15 |      2.   Venue is appropriate pursuant to 28 U.S.C. §

16 | 1391(b)(2), in that the Middle District of Florida is the judicial

17 | district "...in which a substantial part of the events or omissions

18 | giving rise to the claim occurred...," and where "...a substantial

19 | part of the property that is the subject of the action is

20 | situated."

21 | **The PLAINTIFFS, The Purchasers of the Units**

22 |      3.   Plaintiffs, MICHAEL McGEE and REMA McGEE, are

23 | individuals who are residents of San Jose, California, and are the

24 | owners of the real property commonly known as Unit No. S-619,

25 | located at 7150 N. Tamiami Trail, Sarasota, Florida.

26 |      4.   Plaintiff, ROBERT J. RYAN, is an individual who is a

27 | resident of Berkeley, California, and is the owner of the real

28 | property commonly known as Unit Nos. N-410 and N-412, located at

1   7150 N. Tamiami Trail, Sarasota, Florida.

2        5.   Plaintiffs, DAVID E. SCHEUERMAN and DAWN A.

3   SCHEUERMAN are individuals who are residents of Wheeling, Illinois,

4   and are the owners of the real property commonly known as Unit Nos.

5   C-110 and C-112 located at 7150 N. Tamiami Trail, Sarasota,

6   Florida.

7        6.   Plaintiff, NANCY A. SCHEUERMAN, is an individual who

8   is a resident of Schaumburg, Illinois, and is the owner of the real

9   property commonly known as Unit No. C-112, located at 7150 N.

10   Tamiami Trail, Sarasota, Florida.

11        7.   Plaintiff, JOSEPH PAWLIK, Jr., is an individual who

12   is a resident of Norridge, Illinois, and is the owner of the real

13   property commonly known as Unit No. C-112, located at 7150 N.

14   Tamiami Trail, Sarasota, Florida.

15        8.   Plaintiffs, KIMBERLY MURRAY and SCOTT MURRAY, are

16   individuals who are residents of Whitmore Lake, Michigan, and are

17   the owners of the real property commonly known as Unit No. C-110,

18   located at 7150 N. Tamiami Trail, Sarasota, Florida.

19        9.   Plaintiffs, VICKY POHL and KEVIN POHL, are

20   individuals who are residents of Salt Lake City, Utah, and are the

21   owners of the real property commonly known as Unit No. N-408,

22   located at 7150 N. Tamiami Trail, Sarasota, Florida.

23       10.   Plaintiffs, DANIEL REMUS and DAVID J. REMUS, are

24   individuals who are residents of Kenosha, Washington, and are the

25   owners of the real property commonly known as Unit No. S-607,

26   located at 7150 N. Tamiami Trail, Sarasota, Florida.

27       11.   Plaintiffs, DAYLEN REMUS and TIFFANY REMUS, are

28   individuals who are residents of Fort Meyers, Florida, and are the

1  owners of the real property commonly known as Unit No. S-605,
2  located at 7150 N. Tamiami Trail, Sarasota, Florida.

3         12.   Plaintiffs, HAL HAMPTON and LOURDES HAMPTON, are
4  individuals who are residents of San Ramon, California, and are the
5  owners of the real property commonly known as Unit Nos. C-124 and
6  N-308, located at 7150 N. Tamiami Trail, Sarasota, Florida.

7         13.   Plaintiffs, IAN B. CURRIE and MELISSA CURRIE are
8  individuals who are residents of Phoenix, Arizona, and are the
9  owners of the real property commonly known as Unit No. S-519,
10 located at 7150 N. Tamiami Trail, Sarasota, Florida.

11        14.   VI-C INVESTORS is located in Bradenton, Florida, and
12 is the owner of the real property commonly known as Unit No. N-418,
13 located at 7150 N. Tamiami Trail, Sarasota, Florida.

14        15.   Plaintiff, KURT M. ZURAWSKI, is an individual who is
15 a resident of Port Huron, Michigan, and is the owner of the real
16 property commonly known as Unit No. C-203, located at 7150 N.
17 Tamiami Trail, Sarasota, Florida.

18        16.   Plaintiff, REBECCA L. GRAEBER, is an individual who
19 is a resident of Gulf Breeze, Florida, and is the owner of the real
20 property commonly known as Unit No. C-133, located at 7150 N.
21 Tamiami Trail, Sarasota, Florida.

22        17.   Plaintiffs, TERESA NISIVOCCIA and DAVID NISIVOCCIA
23 are individuals who are residents of Clearwater, Florida, and are
24 the owners of the real property commonly known as Unit No. C-100,
25 located at 7150 N. Tamiami Trail, Sarasota, Florida.

26        18.   Plaintiff, KEVIN HUNTER, is an individual who is a
27 resident of San Diego, California and is the owner of the real
28 property commonly known as Unit No. C-108, located at 7150 N.

1  Tamiami Trail, Sarasota, Florida.

2         19.  Plaintiffs, JOHN JORDAN, JR., and TERI JORDAN, are

3  individuals who are residents of Drexel Hill, Pennsylvania, and are

4  the owners of the real property commonly known as Unit No. C-120,

5  located at 7150 N. Tamiami Trail, Sarasota, Florida.

6         20.  Plaintiff, LUCY D. GREENE, is an individual who is a

7  resident of San Jose, California, and is the owner of the real

8  property commonly known as Unit No. C-232, located at 7150 N.

9  Tamiami Trail, Sarasota, Florida.

10         21.  Plaintiff, DAVID GOETTGE, is an individual who is a

11 resident of Oakland, California, and is the owner of the real

12 property commonly known as Unit No. C-213, located at 7150 N.

13 Tamiami Trail, Sarasota, Florida.

14         22.  Plaintiffs, LYNN E. STEVENSON and JOHN STEVENSON,

15 are individuals who are residents of Longmont, Colorado, and are

16 the owners of the real property commonly known as Unit No. C-103,

17 located at 7150 N. Tamiami Trail, Sarasota, Florida.

18         23.  Plaintiff, LORI WALLER is an individual who is a

19 resident of San Diego, California, and is the owner of the real

20 property commonly known as Unit Nos. N-310 and N-312, located at

21 7150 N. Tamiami Trail, Sarasota, Florida.

22         24.  Plaintiffs, SARIT NETANEL and ERAN NETANEL, are

23 individuals who are residents of Belmont, California, and are the

24 owners of the real property commonly known as Unit No. C-114,

25 located at 7150 N. Tamiami Trail, Sarasota, Florida.

26         25.  Plaintiff, CLARK BLACKWOOD, is an individual who is

27 doing business as BFS EAGLE LLC, and who are residents resident of

28 Longmont, Colorado, and is the owner of the real property commonly

1 | known as Unit No. S-527, located at 7150 N. Tamiami Trail,
2 | Sarasota, Florida.

3 | 26. Plaintiffs, ANDREW M. CRIPE and KRISTI CRIPE, are
4 | residents of Carlsbad, California, and are the owners of the real
5 | property commonly known as Unit No. S-507, located at 7150 N.
6 | Tamiami Trail, Sarasota, Florida.

7 | 27. Plaintiffs, VYTAS ANKAITIS and MARILEE ANKAITIS, are
8 | individuals who are residents of Los Gatos, California, and are the
9 | owners of the real property commonly known as Unit No. C-129,
10 | located at 7150 N. Tamiami Trail, Sarasota, Florida.

11 | 28. Plaintiff, RANDALL RICHARDS, is an individual who is
12 | a resident of Highlands Ranch, Colorado, and is the owner of the
13 | real property commonly known as Unit No. C-212, located at 7150 N.
14 | Tamiami Trail, Sarasota, Florida.

15 | 29. Plaintiffs, J. WALKER and A. WALKER, are individuals
16 | who are residents of San Leandro, California, and are the owners of
17 | the real property located at 7150 N. Tamiami Trail, Sarasota,
18 | Florida.

19 | **THE MARKETING, REALTOR AND SALES PROMOTION DEFENDANTS**

20 | 30. Mike Cook ("COOK"), individually and dba
21 | Ubidproperties.com, is a resident of the State of Arizona, who
22 | promoted the sale of the Sarasota Cay Club units through interstate
23 | advertising, distribution of literature, seminars and promotional
24 | materials, and acted as a real estate broker for the sale of the
25 | Sarasota Cay Club units.

26 | 31. Bryan Marsh ("MARSH"), individually, and dba
27 | Ubidproperties.com, is a resident of the State of Arizona, who
28 | promoted the sale of the Sarasota Cay Club units through interstate

1 | advertising, distribution of literature, seminars and promotional
2 | materials, and acted as a real estate broker for the sale of the
3 | Sarasota Cay Club units.

4 | 32. Green Capital, LLC, dba Ubidproperties.com, is an
5 | Arizona limited liability company, which promoted the sale of the
6 | Sarasota Cay Club units through interstate advertising,
7 | distribution of literature, seminars and promotional materials, and
8 | acted as a real estate broker for the sale of the Sarasota Cay Club
9 | units.

10 | 33. John Sitek ("SITEK"), is a resident of the State of
11 | Arizona, who promoted the sale of the Sarasota Cay Club units
12 | through interstate advertising, distribution of literature,
13 | seminars and promotional materials, and acted as a real estate
14 | broker for the sale of the Sarasota Cay Club units.

15 | 34. International Association of Investors ("IAI"), is a
16 | Florida corporation, which promoted the sale of the Sarasota Cay
17 | Club units through interstate advertising, distribution of
18 | literature, seminars and promotional materials, and acted as a real
19 | estate broker for the sale of the Sarasota Cay Club units.

20 | 35. Don Burnham ("BURNHAM"), is a resident of the State
21 | of Florida, who promoted the sale of the Sarasota Cay Club units
22 | through interstate advertising, distribution of literature,
23 | seminars and promotional materials, and acted as a real estate
24 | broker for the sale of the Sarasota Cay Club units.

25 | 36. Justin Burnham ("J. BURNHAM"), is a resident of the
26 | State of Florida, who promoted the sale of the Sarasota Cay Club
27 | units through interstate advertising, distribution of literature,
28 | seminars and promotional materials, and acted as a real estate

1  broker for the sale of the Sarasota Cay Club units.

2      37.  Marc Burnham ("M. BURNHAM"), is a resident of the

3  State of Florida, who promoted the sale of the Sarasota Cay Club

4  units through interstate advertising, distribution of literature,

5  seminars and promotional materials, and acted as a real estate

6  broker for the sale of the Sarasota Cay Club units.

7      38.  George Homick ("HOMICK"), is a resident of the State

8  of Florida, who promoted the sale of the Sarasota Cay Club units

9  through interstate advertising, distribution of literature,

10 seminars and promotional materials, and acted as a real estate

11 broker for the sale of the Sarasota Cay Club units.

12     39.  Cindy Richichi ("RICHICHI"), is a resident of the

13 State of Florida or Nevada, who promoted the sale of the Sarasota

14 Cay Club units through interstate advertising, distribution of

15 literature, seminars and promotional materials, and acted as a real

16 estate broker for the sale of the Sarasota Cay Club units.

17     40.  Kelly Schnorenberg, ("SCHNORENBERG"), is a resident

18 of the State of Colorado, who promoted the sale of the Sarasota Cay

19 Club units through interstate advertising, distribution of

20 literature, seminars and promotional materials, and acted as a real

21 estate broker for the sale of the Sarasota Cay Club units.

22     41.  Select Market Real Estate, ("SELECT MARKET"), is a

23 Colorado corporation, which promoted the sale of the Sarasota Cay

24 Club units through interstate advertising, distribution of

25 literature, seminars and promotional materials, and acted as a real

26 estate broker for the sale of the Sarasota Cay Club units.

27     42.  ICG, ("ICG"), is a California corporation, which

28 promoted the sale of the Sarasota Cay Club units through interstate

---

1 | advertising, distribution of literature, seminars and promotional
2 | materials, and acted as a real estate broker for the sale of the
3 | Sarasota Cay Club units.

4 |     43. Adiel Gorel ("GOREL"), is a resident of the State of
5 | California, who promoted the sale of the Sarasota Cay Club units
6 | through interstate advertising, distribution of literature,
7 | seminars and promotional materials, and acted as a real estate
8 | broker for the sale of the Sarasota Cay Club units.

9 |     44. Dan Beit ("BEIT"), is a resident of the State of
10 | California, who promoted the sale of the Sarasota Cay Club units
11 | through interstate advertising, distribution of literature,
12 | seminars and promotional materials, and acted as a real estate
13 | broker for the sale of the Sarasota Cay Club units.

14 |     45. Trudy Herrell ("HERRELL"), is a resident of the
15 | State of California, who promoted the sale of the Sarasota Cay Club
16 | units through interstate advertising, distribution of literature,
17 | seminars and promotional materials, and acted as a real estate
18 | broker for the sale of the Sarasota Cay Club units.

19 |     46. Ron Tager ("TAGER"), is a resident of the State of
20 | California, who promoted the sale of the Sarasota Cay Club units
21 | through interstate advertising, distribution of literature,
22 | seminars and promotional materials, and acted as a real estate
23 | broker for the sale of the Sarasota Cay Club units.

24 |     47. Wealth Quest Investments, ("WEALTH QUEST"), is an
25 | entity unknown organized under the laws of the State of Utah, which
26 | promoted the sale of the Sarasota Cay Club units through interstate
27 | advertising, distribution of literature, seminars and promotional
28 | materials, and acted as a real estate broker for the sale of the

1  Sarasota Cay Club units.

2      48.   Barry Graham, ("GRAHAM"), is a resident of the State
3  of Florida, who promoted the sale of the Sarasota Cay Club units
4  through interstate advertising, distribution of literature,
5  seminars and promotional materials, and acted as a real
6  estate broker for the sale of the Sarasota Cay Club units.

7      49.   Ricky Stokes ("STOKES"), is a resident of the State
8  of Florida, who promoted the sale of the Sarasota Cay Club units
9  through interstate advertising, distribution of literature,
10  seminars and promotional materials, and acted as a real estate
11  broker for the sale of the Sarasota Cay Club units.

12      50.   Colin Brechbill ("BRECHBILL"), is a resident of the
13  State of Florida, who promoted the sale of the Sarasota Cay Club
14  units through interstate advertising, distribution of literature,
15  seminars and promotional materials, and acted as a real estate
16  broker for the sale of the Sarasota Cay Club units.

17      51.   John Sinclair ("SINCLAIR"), is a resident of the
18  State of Florida, who promoted the sale of the Sarasota Cay Club
19  units through interstate advertising, distribution of literature,
20  seminars and promotional materials, and acted as a real estate
21  broker for the sale of the Sarasota Cay Club units.

22      52.   Stuart Kaplan ("KAPLAN"), is a resident of the State
23  of Florida, who promoted the sale of the Sarasota Cay Club units
24  through interstate advertising, distribution of literature,
25  seminars and promotional materials, and acted as a real estate
26  broker for the sale of the Sarasota Cay Club units.

27      53.   Gail Taylor ("G. TAYLOR"), is a resident of the
28  State of Florida, who promoted the sale of the Sarasota Cay Club

1 units through interstate advertising, distribution of literature,
2 seminars and promotional materials, and acted as a real estate
3 broker for the sale of the Sarasota Cay Club units.

**CONDOMINIUM MANAGEMENT DEFENDANTS**

5       54.   Parkview Hospitality Group, LLC, ("PARKVIEW"), is a
6 Florida limited liability company, which operates as a management
7 company of the condominium units located at the Sarasota Cay Club.

8       55.   Greg Wright, ("WRIGHT"), is a resident of the State
9 of Florida, who operates as a manager of the condominium units
10 located at the Sarasota Cay Club.

11      56.   Sarasota Cay Clubs COA Inc., ("SCC-COA"), is a
12 Florida corporation, which operates as a management company of the
13 condominium units located at the Sarasota Cay Club.

14      57.   Nicholas Mavrikas, ("MAVRIKAS"), is a resident of
15 the State of Florida, who operates as a manager of the condominium
16 units located at the Sarasota Cay Club.

17      58.   Robert Haywood ("HAYWOOD"), is a resident of the
18 State of Florida, who operates as a manager of the condominium
19 units located at the Sarasota Cay Club.

20      59.   Derek Taylor is one of the founders for the Sarasota
21 Cay Club COA along with defendants Gary Schwarz and David Schwarz.
22 Derek Taylor ("D. TAYLOR"), is a resident of the State of Florida,
23 and operates and/or operated as a manager of the condominium units
24 located at the Sarasota Cay Club.

**PURCHASING AND OWNER DEFENDANTS**

26      60.   S Bay, LLC, ("S BAY"), is a Florida limited
27 liability company, which was involved in the creation (directly or
28 indirectly) and/or ownership of the Sarasota Cay Club condominium

1   subdivision, and/or took title to what was designated as the
2   "common elements" of the Sarasota Cay Club subdivision.

3          61.   S-Bay Development, LLC, ("S-BD, LLC"), is a Florida
4   limited liability company, which was involved in the creation
5   (directly or indirectly) and/or ownership of the Sarasota Cay Club
6   condominium subdivision, and/or took title to what was designated
7   as the "SHARED elements" of the Sarasota Cay Club subdivision.

8          62.   Sunvest Resorts Communities LLC, ("SUNVEST"), is a
9   Florida limited liability company, which was involved in the
10  creation (directly or indirectly) and/or ownership of the Sarasota
11  Cay Club condominium subdivision, and/or took title to what was
12  designated as the "common elements" of the Sarasota Cay Club
13  subdivision.

14         63.   GSJV MIG LLC, ("GSJV"), is a Florida limited
15  liability company, which was involved in the creation (directly or
16  indirectly) and/or ownership of the Sarasota Cay Club condominium
17  subdivision, and/or took title to what was designated as the
18  "common elements" of the Sarasota Cay Club subdivision.

19         64.   Harris Friedman ("FRIEDMAN"), is a resident of the
20  State of Florida or Nevada, who was involved in the creation
21  (directly or indirectly) and/or ownership of the Sarasota Cay Club
22  condominium subdivision, and/or took title to what was designated
23  as the "common elements" of the Sarasota Cay Club subdivision.

24         65.   Harvey Birdman ("H-BIRDMAN"), is a resident of the
25  State of Florida or Nevada, who was involved in the creation
26  (directly or indirectly) and/or ownership of the Sarasota Cay Club
27  condominium subdivision, and/or took title to what was designated
28  as the "common elements" of the Sarasota Cay Club subdivision.

1       66.   Herbert Hirsch ("HIRSCH"), is a resident of the
2   State of Florida or Nevada, who was involved in the creation
3   (directly or indirectly) and/or ownership of the Sarasota Cay Club
4   condominium subdivision, and/or took title to what was designated
5   as the "common elements" of the Sarasota Cay Club subdivision.

6       67.   Harvey Birdman Revocable Trust ("HBRT"), is, upon
7   information and believe, an entity unknown, which was involved in
8   the creation (directly or indirectly) and/or ownership of the
9   Sarasota Cay Club condominium subdivision, and/or took title to
10  what was designated as the "common elements" of the Sarasota Cay
11  Club subdivision.

12      68.   Diane S. Birdman, ("D.S. BIRDMAN"), is a resident of
13  the State of Florida or Nevada, who was involved in the creation
14  (directly or indirectly) and/or ownership of the Sarasota Cay Club
15  condominium subdivision, and/or took title to what was designated
16  as the "common elements" of the Sarasota Cay Club subdivision.

17      69.   Diane S. Birdman Revocable Trust, ("DBRT"), is, upon
18  information and belief, an entity unknown, which was involved in
19  the creation (directly or indirectly) and/or ownership of the
20  Sarasota Cay Club condominium subdivision, and/or took title to
21  what was designated as the "common elements" of the Sarasota Cay
22  Club subdivision.

23      70.   Louis Birdman, ("L. BIRDMAN"), is a resident of the
24  State of Florida or Nevada, who was involved in the creation
25  (directly or indirectly) and/or ownership of the Sarasota Cay Club
26  condominium subdivision, and/or took title to what was designated
27  as the "common elements" of the Sarasota Cay Club subdivision.

28      71.   Louis Birdman Revocable Trust, ("LBRT"), is, upon

1  information and belief, an entity unknown, which was involved in
2  the creation (directly or indirectly) and/or ownership of the
3  Sarasota Cay Club condominium subdivision, and/or took title to
4  what was designated as the "common elements" of the Sarasota Cay
5  Club subdivision.

6  72.  Bonita Hirsch ("B. HIRSCH"), is a resident of the
7  State of Florida or Nevada, who was involved in the creation
8  (directly or indirectly) and/or ownership of the Sarasota Cay Club
9  condominium subdivision, and/or took title to what was designated
10  as the "common elements" of the Sarasota Cay Club subdivision.

11  73.  Bonita Hirsch Revocable Trust, ("BHRT"), is, upon
12  information and belief, an entity unknown, which was involved in
13  the creation (directly or indirectly) and/or ownership of the
14  Sarasota Cay Club condominium subdivision, and/or took title to
15  what was designated as the "common elements" of the Sarasota Cay
16  Club subdivision.

17  74.  DC 705 JV, ("DC705-JV"), is, upon information and
18  belief, an entity unknown organized under the laws of the State of
19  Florida, which was involved in the creation (directly or
20  indirectly) and/or ownership of the Sarasota Cay Club condominium
21  subdivision, and/or took title to what was designated as the
22  "common elements" of the Sarasota Cay Club subdivision.

23  75.  DC 705, LLC, ("DC705-LLC"), is a Florida limited
24  liability company, which was involved in the creation (directly or
25  indirectly) and/or ownership of the Sarasota Cay Club condominium
26  subdivision, and/or took title to what was designated as the
27  "common elements" of the Sarasota Cay Club subdivision.

28  76.  CC 705, LLC ("CC705"), is a Florida limited

1  liability company, which was involved in the creation (directly or
2  indirectly) and/or ownership of the Sarasota Cay Club condominium
3  subdivision, and/or took title to what was designated as the
4  "common elements" of the Sarasota Cay Club subdivision.

5         77.   JDI Tavasta LLC, is an Illinois Limited Liability
6  Company which was involved in the creation (directly or indirectly)
7  and/or ownership of the Sarasota Cay Club condominium subdivision,
8  and/or took title to what was designated as the "common elements"
9  of the Sarasota Cay Club subdivision.

10        78.   Jeffrey Aeder ("AEDER"), is an Illinois resident who
11 was involved in the creation (directly or indirectly) and/or
12 ownership of the Sarasota Cay club Condominium subdivision, and/or
13 took title to what was designated as the "common elements" of the
14 Sarasota Cay club subdivision.

15        79.   Kevin Conner ("CONNER") is an Illinois resident, who
16 was involved in the creation (directly or indirectly) and/or
17 ownership of the Sarasota Cay club Condominium subdivision, and/or
18 took title to what was designated as the "common elements" of the
19 Sarasota Cay club subdivision.

20        80.   Colonial Bancgroup, Inc., ("COLONIAL") is a Florida
21 corporation, which was involved in the creation (directly or
22 indirectly) and/or ownership of the Sarasota Cay Club condominium
23 subdivision, and/or took title to what was designated as the
24 "common elements" of the Sarasota Cay Club subdivision.

25        81.   David W. Schwarz, ("SCHWARZ"), is a resident of the
26 State of Florida, who was involved in the creation (directly or
27 indirectly) and/or ownership of the Sarasota Cay Club condominium
28 subdivision, and/or took title to what was designated as the

"common elements" of the Sarasota Cay Club subdivision.

82.   F. Dave Clark ("CLARK"), also known as "Dave Clark," "David Clark" and/or "Fred Clark," is a resident of the State of Florida or Nevada, who was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

83.   Waterfront Resort Realty, ("WATERFRONT"), is, upon information and belief, an entity unknown organized under the laws of the State of Florida, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

84.   Cristal Clear Keys Realty LLC, ("CRISTAL CLEAR"), is a Florida limited liability company, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

85.   IMGA Academies ("IMGA"), is a Florida limited liability company, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

86.   David S. Band ("BAND"), is a Florida resident who was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the

1  Sarasota Cay Club subdivision.

2  **APPRAISAL DEFENDANTS**

3       87. Joseph Goenner, ("GOENNER"), is a resident of the

4  State of Florida, who provided appraisals of certain of the units

5  at the Sarasota Cay Club, through his company, Benchmark Appraisal

6  Services, Inc., ("BENCHMARK"), a Florida corporation.

7       88. David E. Driggers, ("DRIGGERS"), is a resident of the

8  State of Florida, who provided appraisals of certain of the units

9  at the Sarasota Cay Club through his company Real Property

10  Appraisers, Inc., ("RPAI"), a Florida corporation, which provided

11  appraisals of certain of the units at the Sarasota Cay Club.

12  **ATTORNEY DEFENDANTS**

13       89. Stump, Storey, Callahan, Dietrich & Spears,

14  ("SSCD&S"), is a professional association law firm with its

15  principal place of business located in the State of Florida, who

16  received compensation for services allegedly provided to the

17  PLAINTIFFS relating from the sale of the Sarasota Cay Club units.

18       90. W. Scott Callahan, ("CALLAHAN"), is a resident of the

19  State of Florida, an attorney admitted to the Bar of the State of

20  Florida, who received compensation for services allegedly provided

21  to the PLAINTIFFS relating from the sale of the Sarasota Cay Club

22  units.

23  **LENDING INSTITUTION AND MORTGAGE BROKER DEFENDANTS**

24       91. JP Morgan Chase Bank, N.A., ("CHASE"), is a New York

25  corporation, which is a mortgage lending institution for certain of

26  the Sarasota Cay Club units.

27       92. Ross Pickard ("PICKARD"), is a resident of the State

28  of Florida, who was and/or is a mortgage broker for defendant

1  CHASE.

2      93. National City Mortgage, ("NATIONAL CITY") is an

3  entity unknown with its principal place of business located in

4  Miamisburg, Ohio, which is a mortgage lending institution for

5  certain of the Sarasota Cay Club units.

6      94. Craig Flaherty ("FLAHERTY"), is a resident of the

7  State of Florida or Nevada, who was and/or is a mortgage broker for

8  defendant NATIONAL CITY.

9      95.  Fifth Third Bank ("FIFTH THIRD") is an entity

10  unknown with its principal place of business located in Florida,

11  which is a mortgage lending institution for certain of the Sarasota

12  Cay Club units.

13      96.  Orion Bank ("ORION") is an entity unknown with its

14  principal place of business located in Florida, which is a mortgage

15  lending institution for certain of the Sarasota Cay Club units.

16      97.  Heather Morrison ("MORRISON"), is a resident of the

17  State of Florida, who was and/or is a mortgage broker for defendant

18  Orion.

19  **TITLE COMPANY DEFENDANTS**

20      98. Commonwealth Title ("COMMONWEALTH") is an entity

21  unknown with its principal place of business located in Florida,

22  which is a title company identified as to the sale of certain of

23  the Sarasota Cay Club units.

24      99.  Fidelity Title ("FIDELITY") is an entity unknown

25  with its principal place of business located in Florida, which is a

26  title company identified as to the sale of certain of the Sarasota

27  Cay Club units.

28  ///

---

1

**SUMMARY**

2          100.  This complaint brought on behalf of forty-two (42)

3     plaintiffs ("PLAINTIFFS"), asserts a terrible fraud against the

4     PLAINTIFFS who, during 2006 and 2007, purchased single sixteen year

5     old, 303 to 450 square foot rooms for close to $1,000.00 a square

6     foot, and who were falsely lead to believe they were purchasing

7     condominium units, at the address commonly known as 7150 North

8     Tamiami Trail, Sarasota, Florida 34243, known as the "Sarasota Cay

9     Club," and now known as the "Sarasota Hotel & Marina."

10          101.  PLAINTIFFS are the subject of a fraudulent scheme by

11    developers, promoters, real estate agents, loan brokers, possibly

12    appraisers and at least one law firm, among others, to purchase

13    what PLAINTIFFS believed were condominiums which were suitable for

14    a second home, which were represented and appraised to include

15    "common elements," such as marinas, swimming pools, common grounds,

16    boat docks and parking, restaurants, and other improvements.

17          102.  The fraud committed by the defendants, as set forth

18    more fully below, is found in the fact that the plaintiff

19    purchasers were induced to purchase sixteen year old, one room/one

20    bathroom single apartment units, at close to $1,000.00 per square

21    foot, without receiving any of the common elements, or amenities

22    that are associated with the advertised and promoted sale of the

23    condominium units and without any common areas, including parking

24    or any other element promoted and advertised which would be

25    "condominium property" as defined under Florida law.

26          103.  As a result of the fraud, which constituted both

27    common law fraud, and violations of the Interstate Land Sales Act,

28    Violation of the Federal Securities Laws, and a violation of RICO,

1  PLAINTIFFS have been harmed, were induced to undertake and borrow
2  upwards of $300,000.00 each for units whose value was in fact worth
3  less than $20,000.00 each, and who became indebted based upon the
4  deception of the defendants.

5          104. In 2006 and 2007, defendants marketed and offered
6  for sale, condominium units identified as the Sarasota Cay Clubs, a
7  converted 189 single room motel.  Each room was approximately 303
8  to 450 square feet, with a single bathroom.

9          105. The Sarasota Cay Clubs condominium development as
10 advertised was approximately seven acres, with considerable open
11 space, a marina, boat dock, swimming pool, meeting rooms,
12 restaurant, commercial space and other facilities.  The advertising
13 and promotional materials, and Florida law with regard to
14 condominiums, provide that the very definition of the condominium
15 is the unit purchased, with an undivided interest in the common
16 areas or elements <u>of the condominium development</u>.

17         106. Upwards of eighty (80%) percent of the value of the
18 development was the "common areas," the open space, the marina, the
19 boat dock, swimming pool, meeting rooms and other facilities.

20         107. If one were to value the seven acres at $20 million,
21 the common element value would be close to $109,000.00 per unit.

22         108. Yet no purchaser, no plaintiff, received a
23 "condominium unit," as defined under Florida law, though advertised
24 and promoted as a condominium, and as will be described more fully
25 below, though "appraised" as having included in the purchase, the
26 common elements, the open space, and the marina, and other
27 elements.  The actual transaction and deed in fact only provided
28 each of the plaintiffs with a 303 to 450 square foot room, and

bathroom, and access to and from the highway to their unit.

109. The scheme imposed a tragic fraud on the PLAINTIFFS, causing them to borrow hundreds of thousands of dollars for in essence a conveyance of a worthless sixteen year old motel room.

110. The fraud described would be serious enough. However, the fraud was part of a larger scheme, involving those associated with the Cay Clubs, and their development.

### Further Fraud In the Creation of the Cay Clubs

111. The initial fraud, that of non-conveyance, was substantial.  Yet the fraud was much greater, and more pervasive. When one purchases a condominium, one assumes that upon the purchase, the funds for the purchase will be used to pay off the obligations of the condominium project being purchased, and that once the units are sold, the developers no longer have any interest in the project, that the rights to the development are owned in common by the purchasers of the individual condominiums through their homeowners' associations.

112. Unknown to the PLAINTIFFS, the Sarasota Cay Club condominium project was not a standalone project, but was one of a series of inter-related projects in which funds obtained from sales of the Sarasota Cay Club were used to fund other condominium projects or pay off debt of other entities totally unrelated to the Sarasota Cay Club development.

113. Defendants David Band ("BAND"), JDI Tavasta LLC, ("JDI"), and JDI's officers, in conjunction with the Sarasota Cay Club, and through a company identified as Key Hospitality Acquisitions Corporation, created a scheme in 2005 to undertake this fraud as to the PLAINTIFFS.

1    114. In 2005, defendant BAND formed a Florida company

2    identified as IMG Academies ("IMGA"). BAND and his 2005 company,

3    IMGA, Jeffrey Aeder ("AEDER"), JDI CRAPS, Scott Callahan as manager

4    for DC7 (name changed to Cay Club Resorts, Sunvest S-Bay), and

5    other defendants Harvey Birdman, Harris Friedman, Herbert Hirsch,

6    Bonita Hirsch, Louis Birdman, and Diane Birdman, each individually

7    and as trustees of certain trusts, were joint venturers, and joint

8    owners, and of KEY HOSPITALITY which owned and directed the

9    Sarasota Cay Club as of 2005.

10    115. Certain 2005 Cay Clubs promotional materials

11    identify JDI CRAPS, as part of the "development team:"

12    "...The Cay Clubs other strategic partners is
       JDI Loans ... and JDI Realty..." (Exs. Nos. 4
13     and 5).

14    116. As well, an SEC filing of August 7, 2007 (attached

15    as Ex. No. 7) identifies that the Cay Clubs, which specifically

16    includes the Sarasota Cay Club, was part of KEY HOSPITALITY

17    ACQUISITION CORPORATION, in which one of its partners and lenders

18    is BAND's company, IMGA, and in which one of its joint venturers

19    and partners is Jeffrey Aeder, president of JDI CRAPS, JDI Realty,

20    and JDI Loans.

21    117. None of the PLAINTIFFS/buyers were ever apprised

22    that the Sarasota Cay Club was, in fact, in part, a development of

23    Key Hospitality Acquisitions Corporation.  None of the PLAINTIFFS

24    were ever apprised that funds that the PLAINTIFFS paid for their

25    respective units at the Sarasota Cay Club, would be used to pay off

26    pre-existing debt of a organization totally unrelated to the

27    Sarasota Cay Club.

28    118. The Cay Club scheme was in essence as follows:

1         (a)    Sarasota Cay Clubs, controlled by KEY HOSPITALITY

2 would purchase the motel units, with funds provided by BAND or his

3 entity IMGA and/or AEDER and/or his entity, JDI CRAPS ("JDI") or

4 Birdman, Friedman, Hirsch and/or their companies, Sunvest, or S-

5 Bay.

6         (b)    Sarasota Cay Clubs ("SCC") would undertake to market

7 and promote a "condominium development," but which reserved the

8 entire common elements, and all development rights and property

9 subject to the Cay Club, defrauding the purchasers.

10         (c)    Revenue from the sales of units would be paid to

11 non-Sarasota Cay Club persons or entities as opposed to retiring

12 the debt on the development.

13         (d)    As opposed to conventional loans, the Colonial loan

14 provided no fixed amount to be paid off as each unit was sold, so

15 that even if there were sufficient revenue to pay off the Colonial

16 loan, it would not be paid off.

17         (e)    Colonial would then sell its loan rights to other

18 companies associated with the "partnership" such as JDI Tavistock,

19 SBM development, a Florida Corporation, who would then own the

20 entire development and the common elements.

21                **FURTHER FRAUD ON THE PLAINTIFFS**

22         119. PLAINTIFFS allege there was fraud in the initial

23 purchase of the "condominium units," in that the PLAINTIFFS did not

24 receive a "condominium unit" (each individual unit was not even

25 metered) under Florida Law.

26         120. PLAINTIFFS allege that there was a further fraud, in

27 that there was no disclosure to the PLAINTIFFS that the SCC, which

28 was to be owned by the PLAINTIFFS as owners of the condominiums,

1  were part of a scheme in which the SCC development was tied

2  financially to other entities, and that PLAINTIFFS' funds for

3  purchase of their units were used to pay non-disclosed pre-existing

4  obligations to other entities, precluding PLAINTIFFS from ever

5  collectively owning an SCC condominium.

6  <u>**INITIAL 2005 ADVERTISEMENTS**</u>

7  121. Attached as Exhibit No. 1, is an advertisement dated

8  2005 which identifies "Exclusive Cay Clubs developed by Cristal

9  Clear Companies, Sunvest Resort Communities <u>and JDI</u>."

10  122. Attached as Exhibit No. 2, is an advertisement of

11  "The Cay Club Concept, (2005)" which states:

12  "...The Cay Club Concept is in the business of
   creating value through the implementation of
13  world class waterfront amenities.  <u>The
   development team of Cristal Clear Companies,
14  Sunvest Resort Communities and JDI has in
   excess of 50,000 units' development
15  experience.</u>"

16  123. JDI REALTY/LENDING is identified on Cay Club

17  advertisements of 2005 (Ex. No. 3).

18  124. Attached as Ex. No. 4, is an additional 2005

19  advertisement of the Cay Clubs which states in part:

20  "...The Cay Clubs <u>other strategic partner is
   JDI Loans</u>, who is one of the nation's premier
21  real estate lenders <u>and JDI Realty.</u>"

22  125. Attached as Ex. No. 5, are promotional materials

23  from 2005 and/or 2006, which identify:

24  "...The Cay Clubs <u>other strategic partner is
   JDI Loans</u>, who is one of the nation's premier
25  real estate lenders and JDI Realty."

26  126. On March 31, 2005, BAND creates a limited liability

27  company (Ex. No. 6), "IMG/Bollettieri Academies County Club, LLC, a

28  Florida limited liability company, 240 So. Pineapple Avenue, 10th

1  Floor, Sarasota, Florida 34235," with BAND as manager and initial

2  agent of "IMG Academies" or referred to as "IMGA."

3  **SEC FILING**

4     127. Attached as Ex. No. 7, is the face page and selected

5  pages of an August 7, 2007 SEC filing identified as "KEY

6  HOSPITALITY ACQUISITION CORPORATION," ("KEY HOSPITALITY"), for a

7  potential sale of equity interest in Cay Clubs LLC, proposed "value

8  of transaction" of "$434,133,335.80."   Ex. No. 7 includes ten pages

9  of the 250 page SEC filing, pages (marked in upper right hand

10  corner): 24, 27, 52, 56, 67, 68, 75, 76, 89 and 90.

11     (a)   Page 24 of the SEC filing (Ex. No. 7), identifies

12  that KEY HOSPITALITY has been trading over the country since the

13  fourth quarter, 2005.

14  **REFERENCES IN THE SEC FILING TO IMGA, A COMPANY OWNED**

15  **BY DAVID BAND**

16     (b)   Page 27 of the SEC filing (Ex. No. 7), indicates:

17       "...If Cay Club's relationship <u>with IMG</u>
     <u>Academies is terminated</u>, then such event could

18       prevent Cay Clubs from executing all or a
     portion of its existing business plan and

19       therefore significantly reduce Cay Clubs
     revenues and earning."

20

21       (c)   Page 27 of the SEC filing (Ex. No. 7) states:

22       "...Pursuant to its agreements <u>with IMGA</u>
     <u>although Cay Clubs is obligated to present all</u>

23       <u>real estate investment and development</u>
     <u>opportunities to IMGA...</u>"

24     128. BAND, and his company SARASOTA are in fact partners

25  through IMGA, and are partners in KEY HOSPITALITY which owned the

26  SCC as of 2005.

27  **REFERENCES TO JDI OR ITS OWNERS**

28     (d)   Page 52 of the SEC filing (Ex. No. 7) states:

**COMPLAINT**

1
2
3

        "...On February 11, 2007 ... David Clark and
David Schwarz met Jeffrey Aeder a Cay Clubs
financier and partner in several Cay Clubs
properties.  Mr. Aeder reviewed his past
fundings and partnership with Cay Clubs...."

4
5

    129.  PLAINTIFFS plead that Jeffrey Aeder is the president and principal of defendant JDI CRAPS.

6
7

    130. JDI CRAPS is in fact identified as a "2005 Partner" with the Cay Clubs.

8

    **REFERENCES TO BAND'S COMPANY IMGA OR IMG ACADEMIES**

9

    (e)  Page 56 of the SEC filing (Ex. No. 7) states:

10
11

        "...Opportunities exist to continue development
of new resorts, marinas and <u>IMG-related
facilities.</u>"

12

    **REFERENCE TO THE SARASOTA CAY CLUB**

13
14

    (f)  Page 67 of the SEC filing (Ex. No. 7) identifies the Sarasota Cay Club as one of several properties of KEY HOSPITALITY.

15
16
17
18

    (g)  Page 75 of the SEC filing (Ex. No. 7) identifies a $25,000,000.00 note owed by KEY HOSPITALITY, to an unidentified entity, which plaintiffs allege on information and belief is a company owned by BAND.

19
20

    (h)  Page 76 of the SEC (Ex. No. 7) filing identifies "Contractual Obligations:"

21
22

        "...Cay Clubs has contractual obligations and
commitments with regard <u>to IMG's agreement and
the payment of long-term debt.</u>"

23
24

    (i)  Page 89 of the SEC filing (Ex. No. 7) identifies the "IMG Relationship."

25
26
27

    131. PLAINTIFFS allege conspiracy to commit fraud by the nature of the sales, reserving the common elements, and then transfer of the common elements to other entities.

28

    132. PLAINTIFFS plead a conspiracy conceived in 2005, to

1   commit fraud as to the buyers, by and between JDI, through its

2   officers, IMGA, through its officer and owner, BAND, BIRDMAN,

3   FRIEDMAN, HIRSCH and their companies through KEY HOSPITALITY.

4          133. PLAINTIFFS plead that the purpose and intent of the

5   conspiracy to commit fraud, was to sell, what were purported to be

6   condominium units to those in the SCC and other Cay Clubs, asserted

7   as a stand alone development, when it was not, but was

8   contractually obligated to other developments and had common debt

9   and obligations with other developments.

10         134. PLAINTIFFS seek damages based upon violation of the

11  Interstate Land Sales Act, RICO, Federal Securities laws, and at

12  common law, and seek restitution of the funds they have expended,

13  with interest, and seek an order clearing their adverse credit

14  reporting.

15                        **PROMOTIONAL MATERIAL**

16         135. Exhibit No. 8 is promotional material by an entity

17  identified as "Cay Clubs Resorts & Marinas," distributed in 2005,

18  2006, and 2007.

19         (a) Ex. No. 8, pg. 1 states: "Retire Rich & Young In

20  Paradise."

21         (b) Ex. No. 8, pg. 2 states: "Cay Clubs," "What Sets Us

22  Apart" "Built In Equity, Immediate Income, Hedged From Bubble, Exit

23  Strategy."

24         (c) Ex. No. 8, pg., 3 states: "Cay Clubs," "Appraised

25  Value = $275,000," "Purchase Price =$236,694" "16.18% Instant

26  Equity at Close of Escrow," implying that the units are being sold

27  for less than the appraised value.

28         (d) Ex. No. 8, pg., 4 states: "Cay Clubs," "Ownership

1  (these are NOT timeshares)"; "Fee Simple and Warranty Deed."

2       (e) Ex. No. 8, pg., 5 states: "Cay Clubs," "This is a fee
3  simple ownership, just as if you purchased a condominium right in
4  our own neighborhood. This is NOT a timeshare!" And on Ex. No. 8,
5  page 5 is a box that states "Apartment To Condo," "Increase in
6  Value."

7       (f) Ex. No. 8, pg., 6 states: "Cay Clubs," "6.25% In Only
8  with 10% Down."

9       136. Ex. No. 9 is defendants' promotional material with
10 regard to the Sarasota Cay Club.

11      (a) Ex. No. 9, pg., 1 dated "4/18/05" "Sarasota Cay Club
12 Highlights" states: "Starting base price could range from $199,900
13 to $399,900, $5,000 refundable reservation fee to reserve an
14 opportunity to participate, $10,000 additional reservation fee at
15 unit selection total of $15,000 then becomes non refundable."

16      (b) Ex. No. 9, pg., 2, dated "10/05/05" "Cay Clubs,"
17 state: "Starting base price of Phase I units will range from
18 $199,900 to $889,900;" "Furniture Packages include Plasma TV's
19 (Avg. $25,000 Value); "$5,000 refundable Reservation Fee to serve
20 an opportunity to participate," ($10,000 additional Membership Fee
21 at unit selection," "Total of $15,000 Membership Fee then becomes
22 non-refundable; Condo units will require a 10% down payment to
23 secure the required financing."

24      (c) Ex. No. 9, pg., 3 "Cay Clubs," "Sarasota Cay Club
25 $15K Club Membership" "Conversion Condo-Hotel (fallouts)-15%/2 year
26 leaseback attached ($200,000+)."

27      137. Florida State Statute 718.103 (Ex. No. 10) provides:
28      (a) 718.103 (8) "<u>Common elements</u>" means the portions of

1  the condominium property not included in the units."

2       (b) 718.103 (12) "Condominium parcel" means "<u>a unit,</u>
3  <u>together with the undivided share in the common elements</u>
4  <u>appurtenant to the unit.</u>"

5       (c) 718.103 (13) "<u>Condominium property</u>" means "<u>the lands,</u>
6  <u>leaseholds and personal property that are subject to condominium</u>
7  <u>ownership</u>, whether or not contiguous, and all improvements thereof
8  and all easements and rights appurtenant thereto intended for use
9  in connection with the condominium."

10       (d) 718.103 (19) "Limited common elements" means "those
11  common elements which are reserved for the use of a certain unit or
12  units to the exclusion of all other units, as specified in the
13  declaration."

14       138. Florida Statute 718.104 (Ex. No. 11), specifically
15  provides for the "Creation of condominiums; contents of
16  declaration" (Ex. No. 11), <u>which requires for a condominium a</u>
17  <u>declaration under oath, stating by "...all of the owners..." which</u>
18  <u>indicate among other matters: (1) "the name" (2) "...legal</u>
19  <u>description of the land..." (3) "identification of each unit by</u>
20  <u>name and number..." (4) "a survey," (5) "the undivided share of</u>
21  <u>ownership of the common elements</u> and common surplus of the
22  condominium that is appurtenant to each units stated as a
23  percentage of the fractional of the whole," (6) a statement of
24  fractional share of liability for common expenses of the
25  condominium for all residential units...." (emphasis added).

26                    **THE APPRAISALS**

27       139. Attached as Exhibit No. 12 is a typical appraisal of
28  the SCC units in which the borrower is identified as plaintiff Kurt

1  M. Zurawski ("ZURAWSKI").  All appraisals are nearly identical as
2  to all of PLAINTIFFS' units appraised.

3          (a) Ex. No. 12, pg., 1 identifies defendant Joe Goenner,
4  of defendant Benchmark Appraisal Services, and identifies that the
5  appraisal is being sent to defendant "Ross Pickard (at defendant)
6  Chase (Bank)" dated "06/28/2006" for a fee of "$425.00."

7          (b) Ex. No. 12, pg., 2, identifies the property unit as
8  "7150 N. Tamiami Trial, Unit # C203, Sarasota Florida, identifies
9  the "owner" as "defendant "S-BAY DEVELOPMENT LLC."

10         (c) Ex. No. 12, pg., 2 states: "Project Name SARASOTA CAY
11 CLUB," states: Assessor's Parcel # "NOT YET ASSIGNED TO EACH UNIT
12 **6697100052** PROJECT."

13         (d) Ex. No. 12, pg., 2 states "Occupant Owner." And in
14 response to the question on the report "Is the subject property
15 currently offered for sale or has it been offered for sale in the
16 twelve months prior to the effective date of this appraisal," the
17 answer is "YES," and the appraisal (Ex. No. 2, page 2), states:

18             "SALES OFFICE OFFERING PRICE IS 285,980 ON
               06/2006."
19
               (e) Ex. No. 12, pg., 2 refers to "Condominium Unit
20
   Housing Trends" which the appraiser indicates are: "Stable" and "In
21
   Balance" and states: "PRICES ARE STABLE AND DEMAND IS IN BALANCE.
22
   ACCORDING TO THE COMMUTATIVE DATE FROM THE LOCAL BOARD OF REALTORS
23
   NORMAL MARKETING TIME IS 90-180 DAYS."
24
               (f) Ex. No. 12, pg., 2 asks: "Are there any adverse site
25
   conflicts or external factors (easements, encroachment,
26
   environmental conditions, land uses act," which the appraiser
27
   responds "No."
28
               (g) Ex. No. 12, pg., 2, the appraiser responds: "two

1    story," "Effective Age 20," "Total # parking 205," "Guest Parking:
2    ADEQ" The appraiser states NO to the question "Is the developer in
3    control of the Homeowners's association, and states that the
4    project was a conversion to a condominium, and "June 2006, 2005 THE
5    SUBJECT WAS PREVIOUSLY A HOTEL.

6            (i) The Ex. No. 12, page 2 states that the "Owner of
7    Public Record," is "S-BAY DEVELOPMENT LLC," and "CONTRACT IS
8    BETWEEN DC705JV, THE SELLER, AND THE PURCHASER DEBRA A REID ON
9    06/28/2006."

10           (j) To the question (Ex. No. 12, page 2), "Is there any
11   commercial space in the project," the appraiser responds "YES."

12          **DESCRIPTION OF COMMON ELEMENTS IN THE APPRAISAL REPORT**

13          140. Under Florida Law, Section 718.103(13), "Condominium
14   property" means the "lands, leaseholds and persons property that
15   are subject to condominium ownership, whether or not contiguous,
16   and all improvements thereof and all easements and rights
17   appurtenant thereto intended for use in connection with the
18   condominium." Condominium property by law includes the units and
19   all other elements stated under Florida Statute 718.103(13), as
20   well as the "common elements."

21          141. Under Florida Law, Section 718.103(8) "Common
22   elements" means the "portions of the condominium property not
23   include in the units." The clear and unambiguous meaning of Florida
24   Statute is that the "Condominium Property," is the property
25   belonging to the owner, which includes "common elements," those
26   being the elements held in common, "not included in the units,"
27   Florida Statute, 718.103(8).

28          142. In the Appraisal Report (Ex. No. 12, page 3), in

1  response to the question: "Describe all common elements and

2  recreational facilities," the appraiser states: "SWIMMING POOL,

3  CABANA BAR, MARINA WITH GULF ACCESS, COMMON AREAS." And the

4  appraiser states "YES" to the question: "Are the parking facilities

5  adequate for the project size and type?"

6        143. In the Appraisal Report (Ex. No. 12, page 3), in

7  response to the question: "Are there any special or unusual

8  characteristics of the project (based on the condominium documents,

9  HOA meeting, or other information) known to the appraiser," the

10  appraiser responds "No." And the appraiser indicates that "Car

11  Storage," is assigned.

12        144. The Appraisal Report (Ex. No. 12, page 4), provided

13  comparable units of those sold in the Cay Club development itself

14  and one other unit, and again identified "Common Elements

15  Recreations Areas" "POOL/CLUBHOUSE COMMON AREAS," with the

16  appraiser's signature on Ex. No. 12 (page 5), and photographs of

17  the units (indicating two story, twenty-year old apartment

18  buildings, at Ex. No. 12, pages 6, 7, and 8), which show a single

19  hotel room unit of 13.5 by 22.5 feet, with a bathroom included (a

20  total of 303.75 square feet), which is being appraised at and

21  purchased for (Ex. No. 12, page 4) $286,000.00.

22        145. The Appraisal Report (Ex. No. 12, pages 9, 10 and

23  11), show "Additional Site Photos," which include "Boat Dock, Dry

24  Boat Storage, Exercising and Pool Area."

25              **NO COMMON ELEMENTS INCLUDED**

26        146. What the defendant appraisers may not have known,

27  and what the PLAINTIFFS absolutely did not know, was that the

28  documents filed by the seller defendants, excluded from what is

---

**COMPLAINT**

identified under Florida Law as Section 718.103 (13) "Condominium property," any common elements outside of the units, in that all the PLAINTIFFS purchased (in this one example, for $286,000.00) was the one bedroom unit, in a twenty year old motel apartment building, without any parking, any common elements, any of the land upon which the building itself rests, and a license for egress and ingress to the one 303.75 feet of an undeveloped one bedroom apartment.

147. In essence, notwithstanding the promotional material for the sale of the condominium unit, with the amenities of a pool, marina, common areas, the PLAINTIFF purchaser paid $286,000.00, for a 303.75 square foot room (that is $943.89 per square foot), as a home, which does not have a kitchen, in which there is no parking, and with no access or right of ownership of any element of the entire development which is owned by defendants, strangers to the buyers.

148. The inducement by the sellers, their agents, the promoters, defendants "SOUTH BAY DEVELOPMENT LLC," and "DC705JV," ROSS PICKARD, and those associated and in conspiracy with them, was fraudulent, violated the Interstate Land Sales Act, the Federal Securities Act, RICO, and were acts of common law fraud, and conspiracy to commit fraud.

**IDENTIFICATION OF THE REAL PROPERTY WHICH COMPRISE THE DEVELOPMENT**

149. There are two parcels which defendants combined to create the Sarasota Cay Club development. Prior to 2005, the first parcel was that which the Manatee County Assessor had identified as "LOTS 1 AND 2, NORTH ISLES ... BLK 26 WHITFIELD ESTATES" (the "NORTH ISLE PARCEL") (Manatee County Property Appraiser Records,

1   Ex. No. 13), as consisting of <u>4.453 acres</u>.

2        150. As of April 28, 2005, the NORTH ISLE PARCEL includes

3   improvements consisting of three (3), two story hotel buildings, of

4   181 hotel one and two bedroom units, a swimming pool, open space,

5   88 boat slips, improvements used as restaurants, offices, over two

6   hundred parking spaces and other buildings.

7        151. The two story hotel room buildings utilize .93 acres

8   of the NORTH ISLE PARCEL, leaving as "common area" land, swimming

9   pools, boat docks, parking spaces and other improvements,

10  consisting of <u>3.523 acres</u>.

11       152. The SCC development combined with the first NORTH

12  ISLE PARCEL of 4.453 acres, a second parcel which the Manatee

13  County Property Appraiser Records identifies as "Sara Bay Marina"

14  ("SARA BAY") (Appraiser Records, Ex. No. 14), consisting of three

15  parcels, 6665800006, 6721200001 and 6663000059, of approximately

16  three (3) acres.

17       **<u>The Nature of the Transaction</u>**

18       153. On April 28, 2005, a Florida entity, <u>S-Bay</u>

19  <u>Development, LLC</u>, defendant S-BAY, LLC, purchased the 4.453 acre

20  first parcel.

21       154. On April 28, 2005, <u>S-BAY, LLC</u> also purchased the

22  second property, the "Sara Bay Marina."

23       155. A Special Warranty Deed dated April 28, 2005, and a

24  Warranty Deed dated April 29, 2005, are attached as Exhibit No. 15.

25  A Quit Claim Deed dated April 28, 2005 is attached as Exhibit No.

26  16.

27       156. S-BAY, LLC financed the purchase of the two parcels,

28  No. 1 for $10 million, and No. 2 for $6.230 million (total $16.230

1  million), by borrowing more than the purchase, $17,500,000.00, from

2  Colonial Bank N.A. (receiving $1,270,000.00 at the time of

3  purchase) providing to Colonial, two notes of $10,900,000.00 and

4  $6,600,000.00, the NORTH ISLE PARCEL, (the "Holiday Inn") for

5  $10,000,000.00, and "Sara Bay," the second property, for

6  $6,230,000.00 (Manatee County Property Records, Ex. No. 17).

7        157. The April 28, 2005 Mortgage in favor of COLONIAL

8  BANK (Ex. No. 18), however, does not identify a condominium

9  conversion, or release prices.  Defendant COLONIAL did apparently

10  release specific units from encumbrance of the April 28, 2005

11  mortgage upon sales of the units.

12        158. Prior to its April 28, 2005 purchase of the two

13  parcels, NORTH ISLE and Sara Bay (Exs. Nos. 15 and 16), on April

14  26, 2005, S-BAY, LLC entered into a MEMORANDUM OF LEASE AND NOTICE

15  OF OPTION TO PURCHASE with "DC 705 JV, LLC" (Ex. No. 19), for the

16  NORTH ISLE and the "Sara Bay Marina" properties.

17        (a) The April 26, 2005, five (5) page, "Memorandum Of

18  Lease And Notice Of Option To Purchase," ("MEMO") (Ex. No. 19)

19  provides that defendant S-BAY, LLC is the "Landlord," and that

20  defendant DC705JV, is the "Tenant," and provides that DC705JV has a

21  "...twenty-four (24) month 'Lease and Option Term'" from April 26,

22  2005 to April 26, 2007, for 'exclusive use' of the Property."

23        (b) The April 26, 2005, recorded five (5) page MEMO (Ex.

24  No. 19), states at pages 1 and 2 that:

25            "This Memorandum is evidence of record of the
              existence of and certain provisions of the
26            Lease and Option Agreement which may affect the
              rights of parties dealing with the property.
27            This Memorandum shall not limit expand or
              modify the Lease Option Agreement, and in the
28            event of conflict between this Memorandum and
              the Lease or the Option Agreement, the terms of

the Lease and Option Agreement, respectively, shall control." (emphasis added).

(c) The April 26, 2005 MEMO (Ex. No. 19), states (Para., 4) "Copy. A complete copy of the Lease and Option Agreement is available for inspection at the offices of the Tenant," that is at defendant DC705JV.

159. In summary, the April 26, 2005 five (5) page MEMO indicates that the "entire" Lease/Option Agreement is in the offices of defendant DC705JV, available for inspection, and that it is the entire Lease/Option which "...may affect the rights of parties dealing with the property..." and the "..entire..." Lease Option "available for inspection at the offices of the "Tenant," controls.

160. The April 26, 2005 recorded MEMO (Ex. No. 19), identifies "S-BAY Development LLC's signature" is by "Sunvest Resort Communities LLC," by its manager defendant Harris Friedman ("H. FRIEDMAN"). And DC705JV's signature on Ex. No. 19, is by its manager, defendant David Clark ("CLARK").

161. The April 28, 2005 DEED to S-BAY, LLC was by Sarasota Hotel Owners, LP, a Delaware Limited Partnership, by Sarasota Hotel Manager, LP and NP Investment XXII Co., by Christopher S. McKenna.

162. On April 29, 2005, S-BAY, LLC, DC705JV and COLONIAL BANK enter into an eleven (11) page "Subordination, Non-Disturbance and Attornment Agreement" (Ex. No. 20), which provides that DC705JV will have the rights under its lease agreement.

163. The parties to the April 29, 2005 Attornment Agreement, are defendant S-BAY, LLC, by defendant SUNVEST, by its manager defendant H. FRIEDMAN. Defendant Colonia Bank's signatory

1  is Howard Zusman, senior vice president, and defendant DC705JV is

2  by defendant CLARK.

3         164. On <u>September 1, 2005</u>, attorney W. Scott Callahan, of

4  Stump, Storey Callahan, Dietrich & Spears P.A., 37 North Orange

5  Avenue, Suite 200, Orlando Florida 32801, created an eighty-eight

6  (88) page "Declaration of Covenants Restrictions and Easement for

7  Sarasota Cay Club" (Ex. No. 21), recorded "BK 2078 PG 2405 DKT #

8  2231233."

9         165. The eighty-eight (88) page document provides certain

10 matters under definitions:

11        (a) Para., 1(g), "Common Properties," indicates in the

12 definition that:

13            "<u>Notwithstanding the foregoing, the Properties
             have been developed and structured in such a</u>

14            <u>manner to minimize the Common Properties. Most
             components which are typical 'common</u>

15            <u>properties' of a development of this nature
             have instead been designated herein as part of</u>

16            <u>the shared facilities.</u>" (emphasis added) (Ex.
             No. 21 at 2).

17
          (b) Para., 1(x), (Ex. No. 21 at 2), provides that:

18
             "<u>Shared Facilities ... shall be deemed part of</u>

19            <u>the Non-Condominium Lot, whether or not
             contained within the legal Description the</u>

20            <u>condominium Lot and or the club Lot.</u>" Included
             in the definition of "Shared Facilities" was

21            (1) "all sidewalks;" (2) "all perimeter
             landscaping;" (3) "all drives, paths and other

22            areas (serving all Lots)," (4) "all utility,
             mechanical, electrical, telecommunications,

23            plumbing and other systems serving more than
             one Lot..." (5) "all heating, ventilating and

24            air conditioning systems," (6) "all trash
             rooms," and (7) "all master life safety

25            systems." (emphasis added).

26        166. The CC&R's specially excluded from the condominium

27 property under Florida Law, the entirety of the internal elements

28 of the buildings, the mechanical and electrical systems, and all

1   land outside of the buildings, all walkways, "drives, paths and

2   other areas," rendering the ownership limited to the interior of

3   the one room, or two bedroom units themselves.

4         167. On December 22, 2006, Colonial Bank N.A. advanced to

5   S-BAY, LLC, an additional $4,500,000.00, bringing the total

6   indebtedness as of December 22, 2006 to $22,000,000.00 (Ex. No.

7   22).

8         168. During the period October 6, 2005 to December 22,

9   2006, defendants sold 114 condominium (hotel rooms) among others to

10  the PLAINTIFFS for approximately $29,000,000.00, with a total

11  release price to COLONIAL and/or BIRDMAN of $10,243,200.00.

12              **NATURE OF THE TRANSACTIONS IN SELLING THE UNITS**

13        169. Exhibit No. 23 dated October, 2005, provides that

14  Cay Club membership reservations are being accepted, and states:

15              "...We are aggressively accepting both the full
16              and initial membership reservations for
                pre-construction units at the Sarasota Cay Club
                ... Engineering is finalized so we are able to
17              secure the appraisals and the lender
                commitments. Now that this has been
18              accomplished we can provide this information to
                you to expedite the process..."
19
        170. Exhibit No. 24, dated January, 2006, represents:
20
                "...Properties throughout the state of Florida
21              with comparables to the Sarasota Cay club are
                coming in between $879 and $2012 a square foot!
22              Preconstruction pricing at Sarasota Cay Club is
                still under $450.00 per sq. foot..."
23
        171. Attached as Exhibit No. 25, is a brochure circulated
24
    during 2005 and 2006, titled "Sarasota Cay Club."   The brochure
25
    depicts, a modern, newly renovated and state of the art, "Mixed
26
    Use" resort.
27
        172. Exhibit No. 26, is Page 4 of a brochure for the "Cay
28
    Clubs Resorts and Marinas," which provides each of the PLAINTIFFS

---

1 was required to purchase a membership in the Cay Club Resorts and
2 Marinas for $5,000.00, where the $5,000.00 "refundable" fee in the
3 "Cay Club Resorts and Marinas," then purportedly allowed PLAINTIFFS
4 to then enter into a "Reservation Agreement" for the Cay Clubs
5 Resorts nationwide.

6     173. Exhibit No. 27, is page one of the "Reservation
7 Agreement For A Membership (Final Version)," by seller, Cay Club
8 International LLC, provides at paragraph No. 3 that:

9     "...This Agreement shall remain in effect for a
    period of thirty (30) days. During this thirty
10     (30) day period, Purchaser shall sign a
    courtesy reservation for Dwelling Units
11     Purchaser selects with the developer."

12     **DECLARATION OF SARASOTA CAY CLUB CONDOMINIUMS**

13     174. On November 17, 2005, DC705JV filed a "Declaration
14 of Sarasota Cay Club Condominiums," 113 pages (Ex. No. 28), which
15 identifies each of the 181 as individual condominium units.

16     175. Both the CC&R's and the Declaration of the Sarasota
17 Cay Club Condominium were filed on November 17, 2005.

18     176. The Declaration of the Sarasota Cay Club Condominium
19 of 113 pages has maps at pages 66-69.

20     (a)  Page 66/113, identifies on the location map the
21 "SITE," which appears to include the entire Cay Club Resort's two
22 properties, with the condominium properties set forth in "meets and
23 bounds."

24     (b)  Page 68/113, states "Sarasota Cay Club A Condominium"
25 which identifies three "EXISTING TWO STORY MASONRY BUILDINGS," and
26 parking, pathways, and walkways.

27     177. One cannot tell, from a reasonable review of the 113
28 page declaration, what is inside or outside of the condominium

---

1  property.

2          178. It appears that on February 29, 2008, at "BK 2248 PG

3  6442 DKT 2568050," that there was possibly a consent "Final

4  Judgment of Foreclosure in favor of JDI Tavasta LLC an Illinois

5  limited liability company," of eleven pages, that may possibly

6  affect the common areas of the Sarasota Cay Club Development

7  against numerous entities, that appear to be related to the initial

8  sellers of the property and owners of the common areas.

9          179. Defendants' documentation provided to the buyer at

10  the time of sale does not disclose the SCC-LLC-FL Reservation and

11  no disclosure was filed under with the Federal Department of

12  Housing and Development as required by Federal Statute 15 U.S.C.

13  1701, et seq.

14      **Appraisers, Brokers, Surveyor, Architects and Mortgage Agents**

15          180. The defendant real estate brokers, agents and

16  appraisers who appraised the SCC-LLC-FL units, negligently or

17  fraudulently, in the $164,050.00 to $307,500.00 range, without

18  "common elements," without parking, or upgrades, which actual value

19  at the time of appraisal was in the $10,000.00 to $30,000.00 range.

20          181. There was an undisclosed dual agency in that the

21  real estate broker defendants who represented the seller,

22  SCC-LLCFL, also represented the PLAINTIFFS, but did not identify

23  their dual representation.

24          182. The DEFENDANTS would direct the buyers to what the

25  sellers identified as specific finance brokers for the preferred

26  lenders, those being CHASE, NATIONAL CITY, or others lending

27  defendants, who funded the initial loans on the units in the

28  $164,050.00 to $307,000.00 range.

---

1         **THE ELEMENTS OF THE TRANSACTION, AND SUBSEQUENT CONDUCT**

2         183. The typical purchase and sale documentation (face

3 page attached as Ex. No. 29), required that the buyers provide a

4 "contribution" fee of $15,000.00 to the Cay Clubs, and a

5 developer's fee (Ex. No. 30), and required the PLAINTIFFS

6 purchasers to agree to lease back their units to a DEFENDANT

7 leasing company for two (2) years (Ex. No. 31), which would

8 purportedly rent out the units as a hotel providing an accounting

9 to the PLAINTIFFS.

10         184. Defendants represented to each PLAINTIFF that

11 defendants would expend a minimum of $25,000.00 for upgrades for

12 each unit, and were promised that the rental income of the units

13 would pay for the respective mortgages.

14         **The HUD Settlement Statement**

15         185. Attached as Exhibit No. 32, is a typical "U.S.

16 Department of Housing And Urban Development Settlement Statements,"

17 for the sale of the SCC-LLC-FL condominium units. Exhibit No. 32

18 identifies:

19         (a)  The "Settlement Statement" ("SS") is prepared by

20 defendant, the law firm, Stump, Callahan, Dietrich & Spears

21 ("SCDS"), 37 North Orange Ave., Suite 200, Orlando, Florida 32802

22 and identifies an "Escrow File Number;"

23         (b)  The Borrower on the attached SS is "Efy Tal;"

24         (c)  The name of the seller is DC705 JV, LLC, "located at

25 16187 US Highway 19, Suite 500 Clearwater, FL 32802;"

26         (d)  The "Lender" is "JP Morgan Chase Bank 4919 Memorial

27 Highway Suite 100, Tampa, FL 33634;"

28         (e)  The "Settlement Agent" is "Stump, Callahan, Dietrich

1   & Spears;"

2          (f) Line 420 identifies "Gross Amount Due To Seller as

3   $188,902;"

4          (g) Line 502 identifies "Settlement Charges to Seller" of

5   $15,065 (a payment to a non-party, who is not identified);

6          (h) Line 603 identifies "Cash" to Seller, $69,501.68;

7          (i) HUD's "1305 Detailed Breakdown of Additional

8   Settlement Charges," indicates (among other charges):

9          (1) Developer's Fee to DC705 JV, LLC, $1,834.00 (which

10  received the $5,000.00 membership fee);

11         (2) "Sarasota CC POA Capital Contributions" $566.54

12  (which appears to be a power of attorney fee); and

13         (3) "Title Examination Fee" to "Stump, Callahan,"

14  $100.00.

15         186. Attached as Exhibit No. 33, is the Lori A. Waller

16  Settlement Statement, for a contact sales price of $328,0550 and

17  includes:

18         (a) "502 Settlement charges to Seller $15,065.00" (again,

19  payment to a non-party who is not disclosed);

20         (b) "603 Cash to Seller $102,508.46;"

21         (c) "506 Release Price to Birdman $170,049.60;"

22         (d) Under the "1305 Detailed Breakdown of Additional

23  Settlement" charges includes:

24         (1) "1305 Developers Fee to DC705 JV, LLC $3,185.00;" and

25         (2) A "Settlement or Closing Fee" to (the defendant

26  Florida law firm) "Stump, Callahan $250.00." The contract has a

27  penalty clause in the event the purchaser/plaintiff did not utilize

28  Stump Storey Callahan Dietrich & Spears as the title insurance

1  agent and closing agent.

2      187. The majority of the buyers, did, in fact, receive

3  fifteen percent (15%) of their purchase price in a lease back

4  payment.

5      188. PLAINTIFFS allege that each of the PLAINTIFFS' HUD

6  settlement statements, indicated payments to the defendant Florida

7  law firm of Stump, Storey & Callahan of $100.00 for title

8  examination, $50.00 for abstract of title documentation, $250.00 as

9  "settlement or closing" agent. At no time the Scott Callahan,

10  Stump Storey Callahan disclose to the plaintiffs that Scott

11  Callahan was indeed a managing agent in DC7 which changed its name

12  to Cay Club resorts. The HUD settlement statements also indicated

13  additional payments to DC705JV of $1,800.00 to $3,000.00.

14      189. PLAINTIFFS allege the only legitimate debt

15  encumbrance on the SCC-LLC-NV parcel was the initial April 29, 2005

16  $17,500,000.00 loan From Colonial Bank.

17      190. During the period 2005 to 2007, the purchase of the

18  121 units provided <u>at a minimum $31,000,000.00</u> for the units with

19  none of the units including the common areas. <u>Approximately $13.5</u>

20  <u>million was paid out of escrow to third parties, whose identities</u>

21  <u>are unknown</u>.

22      **THE HOMEOWNERS' ASSOCIATION**

23      191. As a condition of purchase, the buyers were required

24  to become members of the homeowners association, SCA-HOA, and

25  comply with the Restrictions, Covenants, and Conditions of the

26  SCA-HOA. The SCA-HOA commenced assessing amounts per month to

27  maintain the "shared facilities, commercial unit 4.453 acres,"

28  which the buyers did not in fact own, which were not in fact the

---

1  SCA-HOA accumulated amounts due on each of the parcels.

2  　　　192. In this regard, PLAINTIFFS were assessed fees for

3  maintenance of common areas they did not own.

4  　　　　　　　　　　　　　　I.

5  　　　　　　　**FIRST CLAIM FOR RELIEF**

6  **Violation of Federal Securities Laws, Securities Act of 1933(2)(1),**

7  　**15 U.S.C. 77(b)(1), Securities Exchange Act of 1934 3(a)(10 15),**

8  　　　　　　　**U.S.C.A. 78(c)(a)(10)**

9  　　　193. Plaintiff reincorporate each and every allegation as

10  set forth in this complaint in Paragraphs Nos. 1 through 192 as

11  fully set forth in this paragraph.

12  　　　194. Upon the representations of the DEFENDANTS,

13  PLAINTIFFS entered into purchase and sale agreements to purchase

14  condominium units at the Sarasota Cay Club Development and the

15  Sarasota Cay Club Association.

16  　　　195. The DEFENDANTS' misrepresentations were made in

17  connection with the purchase or sale of the units.

18  　　　196. The PLAINTIFFS invested their money in a common

19  enterprise, the development of the Sarasota Cay Club Condominium

20  Resort, with the expectation of profits as provided in the

21  promotional literature, and the representations made by the

22  DEFENDANTS.

23  　　　197. The PLAINTIFFS lacked the skill and knowledge

24  necessary to manage their respective investments. The condominiums

25  with the rental arrangement and other similar services are offered

26  and sold with an emphasis on the economic benefits to the purchaser

27  to be derived from the managerial efforts of the promoter or a

28  third party designated or arranged by the promoter from rental of

1   the units.

2       198. The offering and contracts provided for a rental

3   pool arrangement, and improvements by the offeror using the funds

4   invested to improve the shared facilities, commercial unit of the

5   property.

6       199. The offer and contracts provided that the buyers

7   must hold their respective units available for rental and must

8   enter into an exclusive rental agent which was designated by the

9   seller, and are materially restricted in the buyer's occupancy or

10  rental of their respective units.

11      200. The DEFENDANTS made representations that were false

12  and induced the buyers into the purchase of the units in violation

13  of the U.S. Securities Laws.

14      201. The PLAINTIFFS seek damages and attorneys' fees

15  against all of the individual and corporate DEFENDANTS.

16      202. The PLAINTIFFS seek that the Court impose a

17  constructive trust on all assets of the individual and corporate

18  DEFENDANTS to insure that PLAINTIFFS obtain their appropriate

19  restitution.

20                          **II.**

21                **SECOND CLAIM FOR RELIEF**

22  **Violation of the Interstate Land Sale Act 15 U.S.C. 1701**

23      203. PLAINTIFFS reallege each and every allegation as set

24  forth in this complaint in Paragraphs Nos. 1 through 192 as if

25  fully set forth in this paragraph.

26      204. The DEFENDANTS unlawfully made use of means or

27  instruments of transportation or communication in interstate

28  commerce or in the mails with respect to the sale of a lot or lots

---

1  at Sarasota Cay Club, which are not exempt under 15 U.S.C. 1702,

2  without filing a statement of record with the Secretary of Housing

3  and Urban Development in violation of 15 U.S.C. 1703(a)1(A) of the

4  Interstate Land Sales Act.

5       205. The DEFENDANTS unlawfully employed a device, scheme,

6  or artifice to defraud the PLAINTIFFS in connection with the sale

7  of a lot or lots at Sarasota Cay Club, which are not exempt under

8  15 U.S.C. 1702(a)2(A) of the Interstate Land Sales Act, and as a

9  direct and proximate result of the DEFENDANTS' fraudulent acts,

10 PLAINTIFFS acted in reliance of such fraudulent representations and

11 were significantly damaged.

12      206. As a result of the DEFENDANTS' violations of 15

13 U.S.C. 1503 of the Interstate Land Sales Act, PLAINTIFFS are

14 entitled to relief under 15 U.S.C. 1709 of the Interstate Land

15 Sales Act, including but not limited to, damages, restitution, and

16 all costs recoverable, including attorneys' fees.

17                    III.

18             **THIRD CLAIM FOR RELIEF**

19             **Violation of the RICO Act**

20      207. PLAINTIFFS reallege each and every allegation as set

21 forth in this complaint in Paragraphs Nos. 1 through 192 as if

22 fully set forth in this paragraph.

23      208. PLAINTIFFS allege that the DEFENDANTS conspired

24 among themselves and undertook acts in furtherance of their

25 conspiracy to: (1) create an enterprise, that of the (a) creation

26 and sale of real estate interests, (b) for the purpose of falsely

27 promoting the sale of the real estate interests, for (c) the

28 purpose of defrauding the buyers who would purchase the real estate

---

1  interests; (2) and through a pattern of such activities of the
2  enterprise; (c) engaged in a pattern of (4) racketeering activities
3  (that is predicate acts), of (5) (a) interstate mail fraud, and (b)
4  interstate wire fraud, causing (6) injury to the PLAINTIFFS.

5     209. The DEFENDANTS undertook to enter into a conspiracy
6  and undertook acts as follows:

7     (a) In April, 2005, the DEFENDANTS purchased real
8  property with upwards of 121 rental units, four buildings, on 4.453
9  units, with 3.5 undeveloped acres and the "Sara Bay Marina";

10    (b) In 2004 and 2005, in investment seminars in many
11 states, and in documentation provided to potential purchasers, the
12 DEFENDANTS, in interstate commerce, promoted the sale of the
13 individual rental units as condominium units, and falsely and
14 fraudulently represented that the DEFENDANTS would provide income
15 and appreciate to the PLAINTIFFS purchasers by developing the
16 shared facilities, commercial unit, upgrading the units, and
17 required the PLAINTIFFS buyers to lease back the condominiums to
18 the DEFENDANTS. The DEFENDANTS represented that the DEFENDANTS
19 would utilize funds received from the sale of the individual units
20 and other funds to develop the shared facilities, commercial unit,
21 by providing a hotel, conference rooms, restaurants, and other
22 improvements, and would utilize the funds received to greatly
23 improve each unit purchased, would invest in and improve the common
24 elements and would manage the development which would result in an
25 appreciation of the value of the individual condominium units and
26 income stream from the rental of the units as a hotel.

27    210. In furtherance of the fraudulent scheme, the
28 DEFENDANTS did not provide the PLAINTIFF investors with a

1  preliminary title report, indicating the extent of any liens on the

2  property, in that other than an initial lien of $17,500,000.00

3  borrowed to purchase the property, there were no additional lawful

4  liens on the 4.453 acres nor the Sara Bay Marina.

5      211. In furtherance of the enterprise, the DEFENDANTS,

6  through fraud and deceit, as to the intentions of developing a

7  resort complex based upon the PLAINTIFFS' investment of their funds

8  to purchase units in the complex, had the PLAINTIFFS join the

9  Sarasota Cay Club, agree to purchase units and lease back their

10 units, with no intention to utilize the funds from the sale of the

11 units or any other funds to upgrade the units, or the common areas,

12 or to create a resort property.

13     212. In furtherance of the enterprise, the DEFENDANTS

14 without proper notice to the PLAINTIFFS reserved what was

15 identified as "shared facilities, commercial unit 4.44 acres" to

16 the DEFENDANTS, when such "shared facilities, commercial unit,"

17 should have been classified as "limited common elements," for the

18 benefit of development of the resort community.

19     213. In furtherance of the fraudulent scheme, the

20 DEFENDANTS conspired among themselves, and possibly with others to

21 cause funding of each purchase, other than those payments made out

22 of escrow for payment to COLONIAL to pay off the initial $17.6

23 million debt, to cause the escrow agent, defendant Stump Storey

24 Callahan Dietrich & Spears, to pay out of each purchase, funds to

25 other DEFENDANTS that had no lien or right to receive such funds.

26 Out of the 121 sales made, each sale resulted in a payment of

27 upwards of 50% to 60% of the funds paid by the financial

28 institution lender, to be paid out of escrow to persons or entities

1  that had no encumbrance on the land, or buildings. Escrow also

2  illegally paid funds for services that were not provided in the

3  sale, or paid funds designated as development fees that were not

4  owing.

5        214. The DEFENDANTS in conspiracy with others engaged in

6  a pattern of such conduct over a period of 2004 to the present,

7  both in Las Vegas, Nevada, Clearwater, Florida, Orlando, Florida,

8  Sarasota, Florida, and in other communities in Florida, and through

9  such pattern of activity caused damage to the PLAINTIFFS.

10        215. On November 20, 2008 Colonial Bank recorded a Lis

11  Pendens against the subject property and the adjacent adjoining

12  Marina.  On March 26, 2009, Colonial Bank assigned it's rights

13  under said mortgage to SBM with a total outstanding balance on said

14  mortgage of $22,698,243.81 (more than the total indebtedness) SBM

15  then assigned their rights to DBM Commercial on May 29, 2009.  DBM

16  retains ownership of all the "common element" and the Marina.  The

17  Plaintiffs are seeking a reversal of the transaction.

18        216. PLAINTIFFS request treble damages of all of

19  PLAINTIFFS' purchases as a result of fraud, and that the DEFENDANTS

20  be held liable for the damages caused to the PLAINTIFFS, and that

21  the Court impose a constructive trust on the assets of the

22  DEFENDANTS to provide restitution for the PLAINTIFFS.

23                      IV.

24            **FOURTH CLAIM FOR RELIEF**

25        **Fraud (Intentional Misrepresentation)**

26        217. PLAINTIFFS reallege each and every allegation as set

27  forth in this complaint in Paragraphs Nos. 1 through 192 as if

28  fully set forth in this paragraph.

---

**COMPLAINT**

218. The entire basis of PLAINTIFFS entering into the purchase and sale agreements and the loan agreements, among other agreements, was based upon fraud and the defendants' intent to commit fraud and intent to commit deceit through the failures to disclose.

219. PLAINTIFFS and each of them are entitled to compensatory damages, resulting from each of their agreements, and entitled to restitution as to all funds paid plus pre-judgment interests, and are entitled to an order of this Court providing a restoration of their credit status.

220. The DEFENDANTS' conduct was fraudulent, despicable and malicious and the PLAINTIFFS are entitled to an award of punitive damages.

**V.**

**FIFTH CLAIM FOR RELIEF**

**Fraud (Concealment)**

221. PLAINTIFFS reallege each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 192 as if fully set forth in this paragraph.

222. The entire basis of PLAINTIFFS entering into the purchase and sale agreements and the loan agreements, among other agreements, was based upon fraud and the defendants' intent to commit fraud and intent to commit deceit through the failures to disclose.

223. PLAINTIFFS and each of them are entitled to compensatory damages, resulting from each of their agreements, and entitled to restitution as to all funds paid plus pre-judgment interests, and are entitled to an order of this Court providing a

1  restoration of their credit status as of the agreements for the
2  purchase and sale which are void ab initio.

3       224. PLAINTIFFS seek damages, and an order restoring
4  their adverse credit reporting, pending the resolution of this
5  case.

6       225. The DEFENDANTS' conduct was fraudulent, despicable
7  and malicious and in the alternative the PLAINTIFFS are entitled to
8  an award of punitive damages.

9                              **VI.**

10                    **SIXTH CLAIM FOR RELIEF**

11                  **Conspiracy To Commit Fraud**

12      226. PLAINTIFFS reallege each and every allegation as set
13 forth in this complaint in Paragraphs Nos. 1 through 192 as if
14 fully set forth in this paragraph.

15      227. The individual and corporate DEFENDANTS made
16 misrepresentations that they did not intend to fulfill.

17      228. The DEFENDANTS, upon the PLAINTIFFS entering into
18 the agreements and contracts, had a fiduciary relationship which
19 required them to disclose all material facts which they did not
20 disclose.

21      229. The individual and corporate DEFENDANTS committed
22 deceit, through intentional misrepresentations and failures to
23 disclose.

24      230. PLAINTIFFS seek damages in an amount to be proven at
25 trial.

26      231. The DEFENDANTS' conduct was fraudulent, despicable
27 and malicious and the PLAINTIFFS are entitled to an award of
28 punitive damages.

---

VII.

**SEVENTH CLAIM FOR RELIEF**

**Professional Negligence**

**(Against the APPRAISAL DEFENDANTS, THE REAL ESTATE BROKERS AND THE**

**MORTGAGE BROKERS)**

232. PLAINTIFFS reallege each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 192 as if fully set forth in this paragraph.

233. The DEFENDANTS offered their professional services to the PLAINTIFFS, operating as real estate agents representing the PLAINTIFFS, operating as APPRAISERS for the benefit of the PLAINTIFFS, and operating as mortgage brokers advising the PLAINTIFFS.

234. The DEFENDANTS owed a duty of professional care to the benefit of the PLAINTIFFS.

235. PLAINTIFFS allege that the DEFENDANTS breached their duty of care and fell below the level of care of a professional who was providing services to the PLAINTIFFS.

236. PLAINTIFFS allege that they have been harmed by the APPRAISAL DEFENDANTS, the REAL ESTATE BROKERS and the MORTGAGE BROKERS.

237. PLAINTIFFS seek damages for breach of professional responsibility by the DEFENDANTS.

VIII.

**EIGHTH CLAIM FOR RELIEF**

**Constructive Trust**

238. PLAINTIFFS reallege each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 192 as if

1   fully set forth in this paragraph.

2   239. PLAINTIFFS allege that the DEFENDANTS committed

3   fraud and engaged in acts of fraudulent transfers and money

4   laundering through interstate commerce by creating false documents

5   indicating the existence of loans between these interrelated

6   companies, laundering funds or transferring funds to fraudulently

7   avoid creditors.

8   240. PLAINTIFFS request that the Court impose a

9   constructive trust as to the entire Sarasota property for the

10  benefit of the PLAINTIFFS and the financial institutions, freeze

11  and find that the DEFENDANTS hold their assets in constructive

12  trust for the PLAINTIFFS for purposes of restitution.

13  ### IX.

14  ### NINTH CLAIM FOR RELIEF

15  ### Breach of Contract

16  ### (Against Defendants Commonwealth and SSCD&S)

17  241. PLAINTIFFS reallege each and every allegation as set

18  forth in this complaint in Paragraphs Nos. 1 through 192 as if

19  fully set forth in this paragraph.

20  242. PLAINTIFFS have performed all obligations of

21  themselves with regard to the title insurance defendants.

22  243. Defendants CLTI and SSCD&S provided title insurance

23  to PLAINTIFFS and each of them. CLTI and SSCD&S also act as the

24  trustee of the initial financial institutions.

25  244. PLAINTIFFS have made a claim that CLTI and SSCD&S

26  owe a duty to clear title and or reimburse PLAINTIFFS for the

27  failure of the title of PLAINTIFFS to the "common elements as

28  defined by Florida Statute in compliance with a Condominium

1  Purchase." CLTI and SSCD&S have not undertaken the duty to clear
2  title.

3       245. PLAINTIFFS allege that upwards of $13,500,000 of the
4  $30,000,000.00 that was the purchase and sale price of the
5  SCCLLC-FL units was paid by CLTI and SSCD&S out of the escrows, to
6  persons or entities unknown, that did not have a recorded lien on
7  the property, resulting in diversion of funds paid by the
8  PLAINTIFFS purchasers to SCC-LLC-FL, which was to be used an
9  improvements for the development of SCC-LLC-FL. CLTI and SSCD&S
10 contend to the contrary.

11      246. Initially, the seller, SCC-LLC-FL, owed
12 $17,500.000.00 to COLONIAL, and COLONIAL SHOULD HAVE BEEN PAID IN
13 FULL.

14      247. On information and belief, PLAINTIFFS allege that
15 certain amounts of the PLAINTIFFS purchaser funds were paid off as
16 identified by CLTI and SSCD&S as "Settlement charges to Seller,"
17 for which no identification is provided.

18      248. PLAINTIFFS allege on information and belief, that
19 upwards of $13,500,000.00 of the $30,000,000.00 that was the
20 purchase and sale price of the SCC-LLC-FL units was paid by CLTI
21 and SSCD&S out of the escrows, to persons or entities unknown, that
22 did not have a recorded lien on the property, resulting in
23 diversion of funds paid by the PLAINTIFFS purchasers to SCC-LLC-FL,
24 which was to be used an improvements for the development of
25 SCCLLCFL.

26      249. In none of the documentation provided to the
27 PLAINTIFFS purchasers was a preliminary title report that indicated
28 the liens on the property at any time.

1    250. The total amount of funds paid for the approximately
2    122 units sold was $30,000,000.00. title reports indicated such
3    liens on the property, and no release documents were ever provided.
4        251. PLAINTIFFS also claim that CLTI and SSCD&S had a
5    fiduciary duty to PLAINTIFFS in acting as the escrow agent,
6    "Settlement Agent," and Title Company, that CLTI and SSCD&S were
7    required to disclose to PLAINTIFFS all liens on the property if
8    any, that CLTI and SSCD&S were required to provide notice to
9    PLAINTIFFS as to any payments made out of escrow identifying all
10   payees which was not undertaken.
11       252. PLAINTIFFS also assert that certain specific
12   payments, to Stump, Callahan, et al., developers' fees, capital
13   contribution fees, were without basis.
14       253. PLAINTIFFS seek damages and reimbursement from
15   defendants CLTI and SSCD&S for the failure to provide disclosures,
16   and for possibly participating in the diversion of funds from the
17   funds due to be paid to SCC-LLC-FL and to others.
18       254. In that CLTI and SSCD&S as the title insurance
19   companies were acting in a dual agent capacity, without disclosure
20   and permission to do so, PLAINTIFFS seek restitution of their
21   investment from CLTI and SSCD&S.
22       255. PLAINTIFFS also assert a claim against the title
23   insurance defendants for failure to prosecute and clear title to
24   the common elements that they insured.
25       256. The deed provided to PLAINTIFFS was ambiguous, and
26   the ambiguity should be drawn in favor of the PLAINTIFFS as against
27   the title insurance defendants.
28       257. PLAINTIFFS seek damages against the title insurance

1  defendants for failing to perform, to clear title, and for damages

2  for the difference between the value of the property received and

3  the property promised and insured.

4                                    X.

5                        TENTH CLAIM FOR RELIEF

6                      Negligent Misrepresentation

7      (Against Defendants JP MORGAN/CHASE, PICKARD, NATIONAL CITY,

8              FIFTH THIRD BANK, ORION BANK, And FLAHERTY)

9            258. Certain PLAINTIFFS only reallege each and every

10  allegation as set forth in this complaint in Paragraphs Nos. 1

11  through 192 as if fully set forth in this paragraph, and certain

12  PLAINTIFFS only allege this claim.  The PLAINTIFFS who do not

13  allege this claim are: K. MURRAY; S. MURRAY; DAVID E. SCHEUERMAN;

14  DAWN A. SCHEUERMAN; NANCY A. SCHEUERMAN; PAWLIK; DAN REMUS; D.

15  REMUS; CLARK BLACKWOOD, DBA BFS EAGLE LLC; T. NISIVOCCIA; D.

16  NISIVOCCIA; VI-C INVESTORS; A. CRIPE; K. CRIPE; J. JORDAN; I.

17  CURRIE; M. CURRIE; T. JORDAN; ZURAWSKI; V. ANKAITIS; M. ANKAITIS;

18  and GRAEBER.

19                           THE APPRAISALS

20           259. As pled, there were two appraisers GOENNER of

21  BENCHMARK, and DRIGGERS of RPAI, which conducted all of the

22  appraisals of all the 183 units in the SCC.

23           260. As PLAINTIFFS have pled, the appraisals were clearly

24  inadequate and misleading, if not in fact fraudulent, in that the

25  appraisals included as comparable units, purported sales of other

26  units in the same SSC complex that had not sold, included valuation

27  of the common elements, which were not included, and apparently the

28  appraisals are identical for the same class of units, with only a

---

1  name change, which is illegal.  PLAINTIFFS allege the appraisal

2  which was undertaken on each model of the same nature, had the name

3  changed for persons who purchased similar models.

4        261. Appraisals were undertaken before the sale and the

5  appraisals were shown to potential buyers to induce them to

6  purchase.  This forbidden practice is entitled "READDRESS

7  APPRAISALS."

8        262. As PLAINTIFFS allege JP MORGAN, NATIONAL CITY, FIFTH

9  THIRD BANK, ORION BANK, and their agents PICKARD and FLAHERTY, and

10  others, breached all governmental regulations, regarding their

11  appraisal process of the units, departed from their duty of care in

12  their use of the appraisal process, and are liable under

13  PLAINTIFFS' claim of negligent misrepresentation because of the

14  departure by these Financial Institution Defendants ("FID"), from

15  regulations imposed upon them by governmental agencies with regard

16  to appraisals, and from adding their name in the promotion, and

17  from their acceptance and agreement to use appraisers nominated by

18  the seller SCC.

19        263. As pled below, these facts establish a prima facie

20  case of lender liability to the PLAINTIFFS under a claim of

21  negligent misrepresentation.

22        **FEDERAL BANKING REGULATIONS REGARDING APPRAISERS**

23        264. Exhibit No. 34, is an <u>October 27, 2003</u> directive of

24  the "Office of the Comptroller of the Currency Board of Governors

25  of the Federal Reserve System, Federal Deposit Insurance

26  Corporation, Office of Thrift Supervisor and National Credit Union

27  Administration."

28        265. Ex. No. 34 provides as a directive, 12 CFR 34,

subparts C and D, FRP: 12 CFR 208, subpart E; Appendix C, and 12 CFR 225, subpart G, FDIC: 12 CFR 323 and 12 CFR Part 365; 12 CFR Part 564 and 12 CFR 560.100, 12 CFR 560.1012, and NCUA 12 CFR part 722.5, to regulated financial institutions that:

        "...This statement applies to all real estate-related financial transactions originated or purchased by a regulated institution for its own portfolio or as assets held for sale.  It provides further clarification of and should be reviewed in conjunction with the agencies appraisal and real estate lending regulations and the Interagency Appraisal and Evaluation Gridlines..."

        266. Ex. No. 34 also provides:

        "...The agencies' appraisal regulations address appraiser independence and require that an institution, or its agent directly engage the appraiser."

        "...Likewise, institutions may not use 'readdressed appraisals' – appraisal reports that are altered by the appraiser to replace any references to the original client with the institution's name. Altering an appraisal report in a manner that conceals the original client or intended users of the appraisal is misleading and violates the agencies' appraisal regulations..."

        267. Ex. No. 34, page 2, provides that the regulations are imposed to require that lending institutions use:

        "...Individuals independent from the loan production area should oversee the selection of appraisers..."

        268. Ex. No. 34, page 2, of the regulations, requires the FID to have persons:

        "...confirm that appraisals and evaluation are reviewed by qualified and adequately trained individuals who are not involved in the loan production process."

        269. Exhibit No. 35, is "FDIC and Thrift Supervision" Regulation Section 323.5, "Appraiser Independence," which states:

1       "...(b) Fee appraisers: (1) If an appraisal is
        prepared <u>by a fee appraiser, the appraiser</u>
2       <u>shall be engaged directly by the regulated</u>
        <u>institution or its agent, and have no direct or</u>
3       <u>indirect interest, financial or otherwise</u>, in
        the property or transaction..." (emphasis
4       added).

5       270. Exhibit No. 36, is 12 CFR Part 34, from the "Office

6   of the Comptroller of the Currency," Section 34.45, "Appraiser

7   Independence," which provides at subparagraph (b) that:

8       "...Fee appraisers: (1) If an appraisal is
        prepared by a fee appraiser, the appraiser
9       shall be engaged directly by the regulated
        institution or its agent, and have no direct or
10      indirect interest, financial or otherwise, in
        the property or transaction..."
11
        271. Exhibit No. 36, also includes 12 CFR Part 34 which
12
    provides regulation of federal banking institutions with regard to
13
    appraisers.  12 CFR Part 34, Section 34.45, in part states:
14
15      "...Fee appraisers: (1) If an appraisal is
        prepared by a fee appraiser, the appraiser
        shall be engaged directly by the regulated
16      institution or its agent, and have no direct or
        indirect interest, financial or otherwise, in
17      the property or transaction..."

18  <u>**CONTRARY TO ALL REGULATIONS, THE SELLER CHOSE THE APPRAISER**</u>

19      272. In the SARASOTA CAY CLUB development, the sellers,

20  selected the two appraisers.  It was the seller that requested the

21  FID to use the seller's selection of the appraisers the FID

22  accepted seller's choice and nomination of the appraiser, contrary

23  to all banking regulations.

24      273. Following the Sixth Circuit's decision in

25  <u>Riestenberg v. Broadview Federal Savings and Loan Co.</u>, 843 F.2d

26  1392 (6th Cir. 1988) (Ex. No. 37), and the Restatement (Second) of

27  Torts, Section 552 (1977), plaintiffs sue the FID for negligent

28  misrepresentation.

---

**COMPLAINT**

274. The authorities as to lender liability to a borrower are fact specific, and given the particular facts alleged, PLAINTIFFS are able to state a claim for lender liability as a matter of fact and law given the specific facts alleged:

> "...One who, in the course of business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information...." Restatement of Torts (Second) 552; Riestenberg, supra at 1393.

275. As PLAINTIFFS allege below, the SARASOTA CAY CLUB relationship with the FID violated federal banking regulations as to the independency of appraisers and appraisals, in that the seller, the SCC, the entity who had an interest in the transaction, chose the appraiser for FID.  The FID CHASE, NATIONAL CITY, FIFTH THIRD BANK and ORION BANK did not, as required as a matter of law, choose their own appraiser.  CHASE, NATIONAL CITY, FIFTH THIRD BANK and ORION BANK adopted and accepted the SCC appraiser as the FID appraiser.

276. The FID also, in violation of banking regulations, utilized the SCC "readdressed" appraisals in direct violation of federal regulations, knew that the SCC were using the appraisals to induce buyers and borrowers to purchase and borrow, and knew that the borrowers and purchasers were relying upon the appraisals which were sponsored by the SCC chosen appraiser, which appraisals were fraudulent.

277. PLAINTIFFS plead that the FID agreed to use the SCC appraiser as opposed to an independent appraiser, did not conduct a

1  review, did not have a disinterested appraiser, and used

2  "readdressed appraisals."

3  ## JP MORGAN CHASE'S PROMOTION OF THE CAY CLUBS

4      278. JP MORGAN CHASE, advertised themselves with the SCC,

5  and were promoted as a preferred lender, in violation of banking

6  regulations, which further creates potential liability for

7  negligent misrepresentation.

8      279. All of the FID used the appraisals and presented

9  them to the buyers not investigating or not having an opinion one

10  way or the other if they were accurate, or may have honestly

11  believed that the appraisals were accurate but had absolutely no

12  reasonable grounds for the belief whatsoever, and are therefore

13  liable for negligent misrepresentation.

14      280. Negligent misrepresentation consists of three

15  elements, (1) representations made to a party that one knows will

16  rely; (2) believing they are true or not having a belief; (3)

17  having no reasonable grounds for the belief.

18      281. Here the FID: (1) presented appraisals to the

19  borrowers, and knew that the SCC were presenting the same

20  appraisals to the borrowers to induce the borrower to purchase the

21  units and borrow funds; (2) knew that the borrowers were relying

22  upon the appraisals, and were relying upon the FID's reliance upon

23  the appraisals; and (3) the FID had absolutely no reasonable

24  grounds for believing that the appraisals were accurate.

25      282. The FID in fact adopted the appraisals of the

26  seller, used "readdressed appraisals," relied upon the seller's

27  choice of the appraiser, all in violation of the very federal

28  banking regulations protecting the consumer and borrower.

## DEFENDANT JP MORGAN/CHASE BANK N.A.

283. PLAINTIFFS also allege that JP Morgan/Chase Bank, N.A., conduct was negligent, grossly negligent and in fact reckless.

(a) Ross Pickard and Connie Pickard were agents or employees of JP MORGAN CHASE N.A.

(b) Ross Pickard and Connie Pickard, appeared at investment seminars attended by potential and actual buyers and borrowers of SARASOTA CAY CLUB units and advertised JP Morgan, Chase N.A., loans to potential buyers and borrowers of the Sarasota Cay Club units.

(c) Attached as Exhibit No. 38, is an advertisement of seminars, "UNIT BUYER FINANCING: INCREASE UNIT SALES BY ALIGNING WITH THE RIGHT LENDER" "REALIZING THE NEED TO CHOOSE A PREFERRED LENDER." "Panel Participants" "Rose Pickard" "Cay Clubs International" (Ex. No. 38 at 2) and identifies "The Pickard Group JP MORGAN/CHASE."

(d) The Pickard Group and Ross Pickard were agents and/or employees of JP MORGAN CHASE N.A., which undertook to promote and SCC sales of units and undertook to promote the loans of JP MORGAN CHASE N.A., in association with the SCC sales of units.

(e) Attached as Exhibit No. 39 is a listing by SCC of preferred lenders. The first preferred lender listed by the SCC is "Ross Pickard, Senior Loan Officer, The Pickard Group, JP Morgan Chase."

(f) JP Morgan Chase N.A., agreed to adopt, accept and utilize only the appraisers chosen by the SCC and all of JP Morgan

1   Chase N.A.'s appraisals of the SCC units which were the subject of

2   JP Morgan Chase's loans.

3        (g)   The departure from the standard of care by JP MORGAN

4   CHASE was so great, that JP MORGAN CHASE knew that the plaintiffs

5   would rely upon the appraisal, had no believe whether they were

6   true and had no basis for asserting their truthfulness to the buyer

7   that the appraisals adopted by JP Morgan Chase N.A., were false or

8   fraudulent.

9        (h)   JP MORGAN CHASE N.A., knew that the appraisals

10  adopted by them for the SCC were not independent appraisals, under

11  Federal Regulations, were in fact appraisals, which appraiser was

12  identified and nominated and recommended by the seller, knew or

13  should have known that the appraisals were "READDRESSED," that the

14  same appraisal was used for different units in the same category of

15  units, JP MORGAN CHASE did not review the appraisals, knew that the

16  seller was utilizing the appraisals, for similar units, adopted by

17  JP MORGAN N.A., for inducing people to purchase units, and did not

18  review the appraisals.   JP MORGAN CHASE lent their name to the SCC

19  sales, endorsed it, was an approved lender, and had no reasonable

20  basis the appraisal was true as JP MORGAN CHASE represented it to

21  the borrower.

22       (i)   JP MORGAN/CHASE N.A., knew or should have known the

23  false appraisals were being communicated to the potential buyers,

24  with CHASE itself, communicated the results of the false appraisals

25  to the buyers and borrowers, had a duty to buyers and borrowers, at

26  a minimum to comply with federal regulations, and to insure that

27  the appraisals were independent were not furnished or influenced by

28  the buyers, and JP MORGAN CHASE N.A., in violation of all federal

---

1   regulations, themselves communicated the results of the false

2   appraisals to the buyers to induce the buyers and borrowers, to

3   purchase the condominiums and borrow funds from Chase.

4          (j)   JP MORGAN/CHASE knew as well, that the nature of the

5   forwarding of loan documents under the instruction of the seller,

6   provided the buyer borrower very limited time to review the

7   documents, imposed upon the buyer and borrower, a very short time

8   period, to consider the loan documentation, and the borrower and

9   buyer not only relied upon the false communications of JP

10  MORGAN/CHASE, as to the appraisal, but JP MORGAN/CHASE in violation

11  of federal regulations, allowed the sellers to administer the

12  purchase and sale documents, in conjunction with the loan

13  documents, breaching a further duty to the buyer/borrower, the

14  plaintiffs in this case.

15         284. PLAINTIFFS other than those identified seek damages

16  against the FID for negligent misrepresentation.

17

18         WHEREFORE, PLAINTIFFS demand:

19         1.   For damages;

20         2.   An order requiring restitution as to all funds paid

21  and expended, in favor of all PLAINTIFFS;

22         3.   An order awarding reasonable attorneys' fees and

23  costs;

24         4.   A preliminary and permanent injunction to preclude

25  all foreclosures and adverse credit reporting and a mandatory

26  injunction to withdraw all adverse credit reporting as to each

27  plaintiff;

28         5.   For punitive damages;

6.    For a determination of PLAINTIFFS' rights and
remedies against defendants CLTI and SSCD&S;

7.    For appointment of a master or receiver;

8.    For treble damages under RICO;

9.    For costs of suit; and

10.    For such other and further relief as the Court may
deem appropriate and necessary under the circumstances.

Respectfully Submitted,

LAW OFFICES OF ALLEN HYMAN

DATED: December 16, 2009        By: _____

Allen Hyman, Esq.
Attorneys for Plaintiffs

1

## DEMAND FOR JURY TRIAL

2              Pursuant to F.R.C.P. Rule 38, PLAINTIFFS request a trial

3 by jury.

4

5                                    Respectfully Submitted,

6                                    LAW OFFICES OF ALLEN HYMAN

7

8 DATED: December 16, 2009      By: _____

9                                    Allen Hyman, Esq.
                                     Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**COMPLAINT**

S:\Shared Data\PC7\Sarasota Cay Club\COMPLAINT121609.wpd